**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 21-CR-0378 (TJK) |
| | : | |
| PAUL RAE | : | |
| KEVIN A. TUCK | : | |
| NATHANIEL A. TUCK | : | |

*EX PARTE* AND UNDER SEAL

<u>**REPORT AND RECOMMENDATION REGARDING SINGLE ATTORNEY**</u>
<u>**REPRESENTING THREE CO-DEFENDANTS IN THE SAME CASE**</u>

Pursuant to the Court's January 31, 2022, Minute Order undersigned counsel respectfully submits the instant report and recommendation regarding whether defense counsel John Pierce's representation of three codefendants, *i.e.*, Paul Rae, Kevin Tuck and Nathaniel Tuck, in the above-captioned case creates a conflict between any of them and Mr. Pierce, and, if so, whether the conflict can be waived by the three clients he represents. Below is a thumbnail recitation of the factual scenario of the charges against Messrs. Paul Rae, Kevin A. Tuck, and Nathaniel A. Tuck, the representations made to undersigned counsel by each of them, attorney John Pierce, and Assistant United States Attorneys Christopher Veatch and William Dreher, followed by a discussion of both the applicable ethical rules,[1] caselaw and other legal authority on the issues, and the potential conflicts that could arise through Mr. Pierce's joint representation of three of the codefendants in this case. Thereafter is a discussion of the Court's oversight powers in a situation that raises a potential conflict followed by a suggested recommendation regarding how to proceed to resolve any conflict issues in this case.

---

[1] All ethical rules cited herein are D.C. Rules of Professional Conduct.

I.     **Factual Background**

   A.   **Charges**[2]

   In this case Paul Rae, Kevin Tuck and Nathaniel Tuck are all charged by indictment (Doc.

No. 72) with Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.

Code §1512(c)(2) and 2 (Count One), Entering and Remaining in a Restricted Building or Grounds,

in violation of 18 U.S. Code §1752(a)(1) (Count Two), Disorderly and Disruptive Conduct in a

Restricted Building or Grounds, in violation of in violation of 18 U.S. Code §1752(a)(2) (Count

Three), Disorderly Conduct in a Capitol Building, in violation of 40 U.S. Code §5104(e)(2)(D)

(Count Five), and Parading, Demonstrating or Picketing in a Capitol Building, in violation of 40

U.S. Code §5104(e)(2)(G) (Count Six).  Additionally, Kevin Tuck is charged with Entering and

Remaining in the Gallery of Congress, in violation of 40 U.S. Code §5104(e)(2)(B) (Count Four),

and Nathaniel Tuck is charged with Civil Disorder, in violation of 18 U.S. Code §231(a)(3) (Count

Seven).

   B.   **Facts**

   From a review of a 16-page Affidavit In Support of Criminal Complaint and Arrest Warrant

for Paul Rae (Doc. 1-1, in 21-MJ-00330) by FBI Special Agent Jesse Marotta (dated March 23,

2021),[3] a 59-page Master Affidavit (and accompanying attachments) by FBI Task Force Officer

---

[2] There are a total of five co-defendants in the above-captioned case, but only three are represented by John Pierce.  Accordingly, discussion of the other two co-defendants, *i.e.*, Arthur Jackman and Edward George Jr., is not included in this report and recommendation.  Specifically, although they are charged in some of the enumerated counts in which Messrs. Rae and Tuck are charged, they are not discussed herein as their circumstances do not appear to implicate any conflict issues *vis a vis* John Pierce or the three co-defendants he represents in this matter.

[3] While, strictly speaking, beyond the scope of this Court's mandate to undersigned counsel, it bears mention that, in reviewing the affidavit in support of Paul Rae's criminal complaint and arrest warrant, undersigned counsel noticed that there is a reference to William Pepe.  *See* Affidavit, p.7, ¶19.  A review of the docket in 21-CR-52 reveals that John Pierce represents Mr. Pepe in that matter, and that the charges in that case also emanate from the events at the United States Capitol on January 6, 2021.  As such, it is conceivable that Mr.

Jeffrey C. Panter (dated July 14, 2021), a 78-page transcript of Kevin A. Tuck's July 15, 2021,

statement to FBI Special Agents Jeffrey C. Panter and Anthony Tomeo,[4] and an excerpt of an FBI

report regarding Paul Rae's arrest forwarded to undersigned counsel by Assistant United States

Attorney Veatch, it appears that the government has evidence indicating, *inter alia*, that Mr.

Pierce's three clients were inside the United States Capitol on January 6, 2021, engaging in various

acts the government contends support the charged lodged by the indictment. Included as part of that

evidence are electronic admissions made by Kevin Tuck and Nathaniel Tuck regarding their

involvement in the events at the United States Capitol on January 6, 2021, that law enforcement

agents uncovered. Moreover, searches of Nathaniel Tuck's iCloud account yielded incriminating

photographs placing Messrs. Rae, Kevin Tuck, and Nathaniel Tuck on the grounds of the United

States Capitol on January 6, 2021. In addition, during a July 15, 2021, interrogation by federal law

enforcement agents, after his arrest and after waiving his *Miranda* rights,[5] and his *Garrity* rights,[6]

Kevin Tuck made various admissions regarding himself and his son, Nathaniel Tuck. Those

admissions included identifying an incriminating photograph of his son and acknowledging that he

and his son were in the District of Columbia in December 2020 and were depicted in photographs

---

Pierce's representation of Mr. Pepe could give rise to conflicts *vis a vis* his representation of Messrs. Rae, and Kevin and Nathaniel Tuck in this case.

[4] Undersigned counsel secured a copy of the Special Agent Jesse Marotta's Affidavit in Support of the Arrest Warrant and Complaint for Paul Rae through a review of the court docket on PACER. Assistant United States Attorney Christopher Veatch provided undersigned counsel with copies of the 59-page Master Affidavit (and accompanying attachments) by FBI Task Force Officer Jeffrey C. Panter (dated July 14, 2021), and the 78-page transcript of Kevin A. Tuck's July 15, 2021, statement to FBI Special Agents Jeffrey C. Panter and Anthony Tomeo.

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966)

[6] *Garrity v. New Jersey*, 385 U.S. 493 (1967)

from that time in Proud Boys clothing. Kevin Tuck also told law enforcement agents that his son, Nathaniel Tuck, was the vice-president of the local Proud Boys chapter.

In his July 15, 2021, statement to law enforcement Kevin Tuck also admitted having met Paul Rae several times and further stated that Paul Rae had been with a group of people who had gathered on January 5, 2021, in the greater metropolitan Washington, D.C. area. Additionally, in his post-arrest statement Kevin Tuck acknowledged to law enforcement that he had communicated with Nathaniel Tuck regarding Paul Rae's arrest. During his interrogation Kevin Tuck also identified a photograph of Paul Rae at the United States Capitol.

Nathaniel Tuck did not make any post-arrest statements to law enforcement and Paul Rae's post-arrest statements did not incriminate anyone but himself.

### C. Mr. Pierce's Compensation

By all accounts Mr. Rae paid Mr. Pierce directly for his services. Additionally, although Nathaniel Tuck initially paid Mr. Pierce the first installment for both himself and his father, Kevin Tuck, the latter has re-paid his son for that initial amount and going forward has paid, or will pay, Mr. Pierce directly himself. In short, it does not appear that there is an issue in this case of a third-party paying for Mr. Pierce's services.

II. **Investigation**

In the course of preparing the instant report and recommendation undersigned counsel spoke separately with Kevin Tuck (on March 10, 2022, and very briefly on March 25, 2022), Nathaniel Tuck (on March 10 and 30, 2022), Paul Rae (on March 11, 2022), John Pierce (on March 28, 2022), and Assistant United States Attorneys Christopher Veatch and William Dreher (on February 18, and March 30, 2022), and separately with Assistant United States Attorney Christopher Veatch (on March 17 and 24, 2022). Undersigned counsel also reviewed the aforementioned 16-page Affidavit In Support of Criminal Complaint and Arrest Warrant for Paul Rae (Doc. 1-1, in 21-MJ-00330) by

FBI Special Agent Jesse Marotta (dated March 23, 2021), the aforementioned 59-page Master Affidavit (and accompanying attachments) by FBI Task Force Officer Jeffrey C. Panter (dated July 14, 2021), the aforementioned 78-page transcript of Kevin A. Tuck's July 15, 2021, statement to FBI Special Agents Jeffrey C. Panter and Anthony Tomeo, and an excerpt of an FBI report regarding Paul Rae's arrest that Assistant United States Attorney Veatch forwarded to undersigned counsel.

### A. Paul Rae

Regarding conflicts Paul Rae reported to undersigned counsel ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

With respect to Mr. Pierce's compensation, Mr. Rae said that ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

### B. Kevin Tuck

In a conversation separate from that which undersigned counsel had with Nathaniel Tuck or

Paul Rae, Nathaniel Tuck's father, Kevin Tuck, explained that ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████ With respect to the payment mechanism Kevin

Tuck indicated ██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

### C. Nathaniel Tuck

On the issue of conflicts Nathaniel Tuck, Kevin Tuck's son, stated to undersigned counsel

that ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

6

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬

Regarding payment for Mr. Pierce's services, Nathaniel Tuck stated that ▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

### D. John Pierce (Defense Counsel)

When undersigned counsel spoke with defense counsel John Pierce he stated that initially he

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Mr. Pierce said he represented Paul Rae before he

represented Kevin and Nathaniel Tuck because Mr. Rae was arrested first.[8] ▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Undersigned

counsel specifically asked Mr. Pierce whether he had had the conversations regarding a possible

conflict with his three clients together or with each separately to which he responded that ▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ In recounting what he had said

to Messrs. Rae, and Kevin and Nathaniel Tuck, Mr. Pierce said that ▬▬▬▬▬▬▬▬▬▬

─────────────────────

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

[8] A review of the docket on PACER reveals that Mr. Pierce entered his appearance for Mr. Rae on March 30, 2021 (Doc. 6), and that he entered his appearance for Nathaniel Tuck (Doc. 32) and Kevin Tuck (Doc. 33) on July 19 and 20, 2021, respectively.

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

[REDACTED]

Mr. Pierce further stated that after reviewing the Report and Recommendation in 21-CR-575,[10] which the Honorable Emmet Sullivan had appointed undersigned counsel to write regarding the same issue of Mr. Pierce's joint representation of multiple codefendants in a single case, as this Court has done, he had [REDACTED]

[REDACTED]

---

[10] On January 31, 2022, undersigned counsel filed a Report and Recommendation in 21-CR-575 on an *ex parte* basis and under seal since it contained privileged information implicating both the privilege against self-incrimination of the codefendants in that matter as well as privileged attorney-client communications between Mr. Pierce and his clients in that case. Thereafter, and after a February 9, 2022, status hearing in that matter, pursuant to court order, undersigned counsel shared the complete Report and Recommendation with Mr. Pierce so that he and undersigned counsel could confer on appropriate redactions which allowed a redacted version of the Report and Recommendation (Doc. 18) to be filed on the open docket on February 25, 2022.

The final area about which undersigned counsel asked Mr. Pierce was his compensation, although undersigned counsel specifically stated that she was not inquiring about how much he was being paid, but rather only about the mechanism by which he was being paid.

E. **Christopher Veatch and William Dreher**[12] (Assistant United States Attorneys)

Assistant United States Attorneys Christopher Veatch and William Dreher told undersigned counsel that the government is not taking a position on whether Mr. Pierce has a conflict in representing Messrs. Paul Rae, Kevin Tuck and Nathaniel Tuck in this matter. That said, Mr. Veatch did indicate that there could be a potential *Bruton*[13] issue in the case, adding that it could possibly be resolved through redaction of any *Bruton* statement(s) or through "dual juries"[14] and that the government did not believe that *Bruton* statement(s) alone, created a conflict for Mr. Pierce in this case.

As far as potential cooperation by one or all three of Mr. Pierce's clients in this case, the government indicated that there is always "room for cooperation," whether in this case or in other cases like the "Nordean/Biggs" matter, *i.e.*, 21-CR-175, adding that the government would be interested in discussing cooperation with one, or all three, of Mr. Pierce's clients in this case. That said, the government explained that it had not had "candid conversations" with Mr. Pierce about his

---

[12] In complete transparency about undersigned counsel's process, this is to disclose that she drafted this five-paragraph section regarding her conversations with the Assistant United States Attorneys in this matter and then provided them a draft of **solely that five-paragraph section** of this Report and Recommendation so that they could correct any factual errors or misunderstandings undersigned counsel had. The rationale for allowing government counsel to review a draft of the paragraphs relating to undersigned counsel's communication with them was that in 21-CR-575, once a redacted version of the Report and Recommendation was filed and the parties had the opportunity to make objections, the government's sole objections seemed to relate to correcting three factual misunderstandings set forth in the Report and Recommendation. In the interest of avoiding any such factual misunderstandings in this case, undersigned counsel thought it prudent to ensure, in advance, that her rendition of what government counsel had shared with her was accurate. Moreover, if this Court follows the procedure used by the Honorable Emmet Sullivan in 21-CR-575, once filed (albeit under seal and on an *ex parte* basis) Mr. Pierce will have an opportunity to review the unredacted Report and Recommendation and to suggest redactions before a redacted version is filed on the open docket. As such, Mr. Pierce will have a corresponding opportunity with respect to what he and his clients shared with undersigned counsel as that afforded government counsel.

[13] *Bruton v. United States,* 391 U.S. 123 (1968).

[14] Mr. Veatch explained the "dual jury" option, if sought and permitted, would involve a separate jury hearing evidence that raised *Bruton* concerns.

**10**

clients in this case cooperating against other defendants.  The government further explained that if any of his clients in this case cooperated or sought to resolve the case with a detailed statement of the offenses, the government's view would be that Mr. Pierce had a conflict in representing them all unless all three, *i.e.*, Paul Rae, Kevin Tuck and Nathaniel Tuck, chose to "act in tandem." Specifically, the government stated that a decision to cooperate or resolve the case by one of Mr. Pierce's three clients  -- whether providing incriminating information about another co-defendant in this case or in a different case, *e.g.*, Nordean *et al.*, 21 CR-175,  -- could work to the detriment of Mr. Pierce's remaining two clients and thus create a conflict.  The government noted that this potential conflict is enhanced when considering the relative value of cooperation that is often realized by the first person to cooperate or resolve charges in a multi-defendant case.  With respect to plea offers, the government indicated that it had not gotten to the point of considering issues of "wiring" plea offers or requiring "insulating statements" as part of any guilty pleas in this case.

Regarding possible defenses, the government acknowledged that there were varying quanta of proof against Mr. Pierce's three clients in this case and so, in theory, counsel for an individual defendant might choose to employ a strategy of emphasizing their client's relatively lower culpability.  The government believed that strategy was unlikely if all Messrs. Rae and Kevin and Nathaniel Tuck were represented by the same counsel.  The government also noted that defense counsel might file motions *in limine* to exclude evidence admissible against one co-defendant that was not admissible against the others or seek limiting instructions regarding evidence that was only admissible against one of the co-defendants.

The government explained that there is evidence of potentially relevant pre- and post-January 6, 2021, communications that were sent by, or to, one but not all three of Mr. Pierce's clients in this case.  Separately Mr. Veatch stated that in Nathaniel Tuck's and Kevin Tuck's iCloud accounts there are "volumes of communication" with their family regarding their motives that would be relevant to

the charged offenses as evidence of their "vitriolic, intense, and passionate state of mind to upset the election." Mr. Veatch also acknowledged that there is evidence that arguably indicates the anti-Semitism and racism of one of Mr. Pierce's clients with which the others may not wish to be associated.

Regarding arguments the government foresees as possible for Messrs. Rae, Kevin Tuck and Nathaniel Tuck, the government explained, as but one example, that Kevin Tuck had been a police officer, and therefore that Nathaniel Tuck could argue that relying on his father, he had followed him into the United States Capitol.[15] Separately, the government noted that Mr. Pierce's three clients in this case may have stronger or weaker connections to other related defendants, noting particularly Nathaniel Tuck's connections to Joseph Biggs (charged in 21-CR-175). Finally, the government did acknowledge that there are differences among Mr. Pierce's three clients in this matter that would be relevant at sentencing.

III.    **Relevant Ethical Rules**

Although a number of ethical rules are implicated when a single lawyer represents multiple codefendants in a case,[16] two ethical rules are directly implicated. One is Rule 1.7 dealing with



[16]Among the other ethical rules relevant where one lawyer represents multiple codefendants in a criminal case is Rule 2.1 (in his capacity as an advisor "a lawyer shall exercise **independent** professional judgment and render candid advice. In rendering advice, a lawyer may refer not only to law but to other considerations such as moral, economic, social, and political factors, that may be relevant to the client's situation.") (emphasis supplied). While Rule 1.3 regarding a lawyer's duty of diligence and zeal states that "(a) A lawyer shall represent a client zealously and diligently within the bounds of the law" and that "(b) A lawyer shall not intentionally: . . . (2) Prejudice or damage a client during the course of the professional relationship." Comment 10 to that Rule explicitly states that "Rule 1.3 is a rule of general applicability, and it is not meant to enlarge or restrict any specific rule. In particular, Rule 1.3 is not meant to govern conflicts of interest, which are addressed by Rules 1.7, 1.8, and 1.9."

conflicts of interest generally, and the second is Rule 1.8 regarding specific situations that may

present a conflict for a lawyer.

**A.**     <u>Rule 1.7</u>

With respect to the general considerations regarding conflicts Rule 1.7 states:

(a) A lawyer shall not advance two or more adverse positions in the same matter.

(b) Except as permitted by paragraph (c) below, a lawyer shall not represent a client with respect to a matter if:

> (1) That matter involves a specific party or parties and a position to be taken by that client in that matter is adverse to a position taken or to be taken by another client in the same matter even though that client is unrepresented or represented by a different lawyer;
> (2) Such representation will be or is likely to be adversely affected by representation of another client;
> (3) Representation of another client will be or is likely to be adversely affected by such representation;
> (4) The lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests.

(c) A lawyer may represent a client with respect to a matter in the circumstances described in paragraph (b) above if

> (1) Each potentially affected client provides informed consent to such representation after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation; and
> (2) The lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client.

D.C. Rules of Professional Conduct, Rule 1.7: Conflict of Interest: General Rule.

**B.**     <u>Rule 1.8</u>

As Rule 1.8 recognizes, a specific concern arises when co-defendants, or even a single

defendant, is represented by a lawyer being compensated by someone other than the person the

lawyer is representing as the lawyer's allegiance to the client may be compromised. Rule 1.8(e)

states:

    (d) A lawyer shall not accept compensation for representing a client from one other than the client unless:

        (1) The client gives informed consent[17] after consultation;
        (2) There is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and
        (3) Information relating to representation of a client is protected as required by Rule 1.6.

D.C. Rules of Professional Conduct, Rule 1.8: Conflict of Interest: Specific Rules

## IV.   **Potential Conflicts**

The Sixth Amendment's guarantee of counsel in a criminal case includes the "right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). *See also Glasser v. United States*, 315 U.S. 60, 70 (1942) (the Sixth Amendment right to counsel "contemplates that such assistance be untrammeled and unimpaired.") Because "[t]he Sixth Amendment's 'essential aim' 'is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers,'" "a criminal defendant's right to counsel of his choice is not absolute." *United States v. Lorenzana-Cordon*, 125 F.Supp.3d 129,134 (D.D.C. 2015), citing *Wheat v. United States*, 486 U.S. 153, 159 (1988). *See also Wheat, supra*, 486 U.S. at 164 (while the court "must recognize a presumption in favor of [the accused's] counsel of choice, . . . that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict.") It has been well recognized that "there are significant dangers inherent in the representation [by a single attorney] of multiple defendants in the course of the same criminal investigation." *United States v. Bikundi*, 80 F.Supp. 3d 9, 22 (D.D.C. 2015).

---

[17] Rule 1.0(e) explains that informed consent is "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."

The six stages and scenarios in which there may be a conflict when a single lawyer represents multiple codefendants in the same case include 1) during plea bargaining, 2) where the defendants have inconsistent defenses, 3) where one or more of the defendants wishes to exercise his right to testify at trial, 4) where the government's evidence may be more damaging to one codefendant than to another, 5) during closing arguments and 6) at sentencing. *See generally*, John Stewart Geer, *Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney*, 62 MINN.L.REV. 119, 125-134 (1978).

In *Holloway v. Arkansas*, 435 U.S. 475 (1978), the Supreme Court recognized some of the conflicts that may arise from joint representation of codefendants by a single attorney:

> Joint representation of conflicting interests is suspect because of what it prevents the attorney from doing . . . [A conflict may] . . . preclude . . . defense counsel . . . from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution, provided a lesser charge or a favorable sentencing recommendation would be acceptable . . .[A] conflict may also prevent an attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing that of another.

435 U.S. at 489-490. *See also Holloway*, 435 U.S. at 490 ("[I]n a case of joint representation of conflicting interests the evil --- it bears repeating --- is in what the advocate finds himself compelled to **refrain** from doing, not only at trial, but also as to possible pretrial plea negotiations and in the sentencing process.") (emphasis in original)

As set forth in The Restatement Third of The Law Governing Lawyers there are several examples of conflicts arising from a single lawyer representing more than one client charged in the same criminal case:

> [I]f one defendant is offered favorable treatment in return for testimony against a co-defendant, a single lawyer could not give advice favorable to one defendant's interests while adhering to the duty of loyalty to the other.

15

> Similarly, individual defendants might have had different motives for and understandings of events, so that establishing a common position among them is difficult. Witnesses who would be favorable to one defendant might be subject to cross-examination that would be unfavorable to another defendant. In closing argument, counsel must choose which facts to stress. For example, stressing the minor role of one defendant might imply the major role of another.

Restatement Third, The Law Governing Lawyers §129.

## A. **Potential Conflicts in This Case**

Based on the factual scenario in the above-captioned case, it appears that there are several potential conflicts that might arise: one in the area of plea negotiations with the government for each of Mr. Pierce's clients; a second in the event of a trial where a) the government may have different quanta of proof against each of Mr. Pierce's three clients, b) his clients may have inconsistent defenses, c) one or more of his clients might testify and, in service to one, Mr. Pierce would be forced to cross-examine another he represents, and/or d) in closing during which Mr. Pierce might have to argue inconsistent positions for each client or argue relative culpabilities among his three clients. A third stage that could present a conflict is at sentencing where, to zealously advocate on behalf of one client, Mr. Pierce might have to argue another client he represents is more culpable.

### 1. Plea Negotiations

Were the government to extend "wired" plea offers to each of Mr. Pierce's clients in the above-captioned case such that for any one client to accept a plea offer, all three would have to do so, the common lawyer's duty of loyalty to a client who wanted to reject a government plea offer that the other two clients wanted to accept would be compromised and adversely affected. Such a scenario also would mean that the client who wanted to reject the plea offer would be taking a position adverse to another client implicating Rule 1.7(b)(1). Separately, were any plea offers,

**16**

regardless of whether they were "wired," to require "insulating" statements, that could well create a conflict for Mr. Pierce's representation of his three clients in this matter.

Even if a plea offer were not wired, during plea negotiations, in an effort to secure a more favorable plea offer for one client, by representing three clients in the same case Mr. Pierce might have to argue the relative culpability of another client, and were a plea offer extended to one client that required cooperation and testimony against another client, that scenario would present a conflict for Mr. Pierce.

    2.   <u>Suppression of Evidence</u>

Because government counsel has indicated that the warrants for the iCloud accounts of Kevin and Nathaniel Tuck were not based in any way on statements made by either of them, or by Paul Rae, conflict issues would not be implicated were there to be challenges[18] made to the validity of those warrants.

    3.   <u>Trial</u>
        a.   <u>Severance/*Bruton*</u>

Seemingly there are multiple "*Bruton* statements" at play in this case, although none from either Paul Rae or Nathaniel Tuck. *See* p. 4, *supra*. The statements Kevin Tuck made implicating Nathaniel Tuck, and to a lesser extent, Paul Rae, arguably raise a potential motion for severance of defendants pursuant to *Bruton*. There are also multiple statements by Kevin Tuck using the first person plural, *i.e.*, "we," thereby implicating more than just himself, although those statements could be redacted to avoid incriminating others.[19] Likewise, Kevin Tuck's identification of Nathaniel Tuck and Paul Rae from photographs he was shown during his July 15, 2021, interrogation implicate Mr. Pierce's other two clients in this case, although it is unclear whether the

---

[18] *See Franks v. Delaware*, 438 U.S. 154 (1978); *United States v. Leon*, 468 U.S. 897 (1984)

[19] *Richardson v. Marsh*, 481 U.S. 200 (1987)

government seeks, or even needs, those statements of identification to be admitted into evidence at trial. Beyond the foregoing, each of Mr. Pierce's three clients may have different and inconsistent positions with respect to pursuing a severance. For a single lawyer to represent all three interests and exercise independent judgment on behalf of each client seems challenging.

### b. Co-Defendant Testimony

There is also the potential that at a joint trial, were one or more of Mr. Pierce's three clients to want to testify and if the testimony of a testifying client of his were to incriminate the others, he would be forced to cross-examine his own client. Were he to do so less than vigorously due to his allegiance to the testifying-client-codefendant, arguably the non-testifying clients would not be receiving the full zealous representation to which they are entitled under the Sixth Amendment. Were he to do so forcefully, or at all, he would be violating his obligation to the testifying-client-co-defendant.

Where a single lawyer has been allowed to represent both the accused and an adverse witness called by the government, courts have deemed the conflict issue to have been avoided where a second lawyer handles the cross-examination of the adverse-witness client. *See e.g.*, *United States v. Lorenzana-Cordon, supra* (where second counsel was appointed to cross-examine witness who was represented by the same lawyer as the accused). Thus, one possible remedy for this eventuality would be to have a second lawyer involved whose sole responsibility would be the cross-examination of Mr. Pierce's testifying client.

### c. Inconsistent Defenses

Also at trial, ███████████████████████████████████████████████ ████████████████████ were they to have inconsistent defenses, or were the government's quantum of proof be greater against one of them than against the others, Mr. Pierce's allegiance to one client might be compromised while serving the others. For example, and without knowing with

18

certainty the defenses each of Mr. Pierce's three clients is contemplating, arguably one or more of them could raise a defense based on duress exerted by one of the other two. This would put Mr. Pierce in the untenable position of having to contend that one of his clients was exerting duress on another. Indeed, in a related vein, the government suggested to undersigned counsel that potentially Nathaniel Tuck could contend that because his father, Kevin Tuck, was a police officer, he merely followed his father into the Capitol, relying on his assessment that it was not illegal to do so. *But see* Note 15, *supra*. As far as the relative quanta of proof the government has against each of Mr. Pierce's clients in this case, at this juncture undersigned counsel cannot tell independently whether there are disparate quanta of proof against each, and so cannot opine on whether that would give rise to a conflict for Mr. Pierce. That said, the government did acknowledge that there are different degrees of proof against each of Mr. Pierce's three clients in this matter, and separately, that two of Mr. Pierce's clients may not want to be tainted by the evidence the government has regarding the third's racism and anti-Semitism.

d. <u>Closing Argument</u>

As in the presentation of evidence, in closing argument, a single lawyer representing three codefendants in this case might need to inculpate or impugn one of his other clients in service to defending another.

4. <u>Sentencing</u>

To secure the most favorable possible sentence for one client, at sentencing a lawyer representing three clients in the same case might have to make arguments regarding the relative culpability of his clients, thereby requiring him to make arguments adverse to a client he maintains is more culpable than the others. Indeed, without providing specifics, the government explicitly stated to undersigned counsel that there are differences among Mr. Pierce's three clients in this case that would be relevant at sentencing.

**19**

V. **Waiver**

Notwithstanding the foregoing, as contemplated by Rule 1.7(c)(1), a single lawyer may represent codefendants in the same matter if "[e]ach potentially affected client provides informed consent to such representation after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation." Rule of Professional Conduct 1.7(c)(1). To establish a valid waiver of any potential conflicts that may arise from a single attorney representing multiple co-defendants requires a knowing and intelligent waiver. *United States v. Lorenzana-Cordon*, 125 F.Supp.3d at 135, citing *Holloway v. Arkansas*, 435 U.S. at 483 n.5. The standard for a knowing and intelligent waiver in the context of a potential conflict born of a single lawyer representing multiple co-defendants in the same case is the same as the standard for waiver of the Sixth Amendment right to counsel. *Glasser v. United States*, 315 U.S. at 71. In *Glasser* the Supreme Court explained

> The trial court should protect the right of the accused to have the assistance of counsel. 'This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused. While the accused may waive the right to counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting for that determination to appear upon the record.'

*Id.*, quoting *Johnson v. Zerbst*, 304 U.S. 458, 465 (1938).

With respect to waivers, at least one commentator has observed that "one must seriously question the ability of most criminal defendants to appreciate fully the significance of conflicts of interest," adding that "[b]ecause of the relationship of trust between attorney and client and the defendant's relative ignorance of criminal trial dynamics, a defendant is likely to defer to the judgment of his counsel and rely on counsel's representation that he can adequately serve the interests of all defendants." John Stewart Geer, *Representation of Multiple Criminal Defendants:*

**20**

*Conflicts of Interest and the Professional Responsibilities of the Defense Attorney, supra*, 62

MINN.L.REV. at 154 (citations omitted). In a similar vein the Supreme Court also has recognized

that potential conflicts arising from a single lawyer representing multiple co-defendants "are

difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a

criminal defendant untutored in the niceties of legal ethics." *Wheat v. United States*, 486 U.S. at

163. Beyond the challenges of a layperson fully grasping the possibilities for potential conflicts that

arise from multiple codefendants being represented by the same attorney, the Supreme Court also

has acknowledged that "the willingness of an attorney to obtain such waivers from his clients may

bear an inverse relation to the care with which he conveys all the necessary information to them."

*Id*.

The validity of a waiver of the right to conflict-free counsel depends on whether it is

voluntary and intelligent, which in turn, "'must depend, in each case, upon the particular facts and

circumstances surrounding that case, including the background, experience and conduct of the

accused.'" *United States v. Carlyle*, 964 F.Supp.8, 14 (D.D.C. 1997) quoting *United States v.

Garcia*, 517 F.2d 272, 277 n.5 (5th Cir. 1975) (citing *Johnson v. Zerbst*, 304 U.S. at 464). While

undersigned counsel does not know the educational backgrounds of each of Mr. Pierce's three

clients in this case, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Additionally, the fact that Kevin Tuck and Nathaniel Tuck are father and son, ought to be

considered when evaluating the validity, *i.e.*, voluntariness, of any waiver. *See, United States v.

Bikundi*, 80 F.Supp.3d at 21 (finding waiver invalid where, *inter alia*, there was "a strong

possibility" that familial dynamics played a role in accused's willingness to waive conflict-free

counsel). To be clear, given undersigned counsel's limited role in this matter, she did not undertake

21

with each Messrs. Rae and Kevin and Nathaniel Tuck, an explanation of possible conflicts and an assessment of whether each of the three co-defendants understood them.

VI.     **The Court's Oversight Powers**

The Supreme Court has recognized that "[t]he Sixth Amendment right to choose one's counsel is circumscribed in several important respects." *Wheat v. United States*, 486 U.S. at 159 (citations omitted). It also has acknowledged the broad oversight powers of federal courts in ensuring that the ethical rules are followed in criminal cases. *Wheat v. United States*, 486 U.S. at 159-160 ("While 'permitting a single attorney to represent codefendants . . . is not *per se* violative of constitutional guarantees of effective assistance of counsel,' a court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel.") citing *Holloway v. Arkansas*, 435 U.S. at 482. In *Wheat*, a case involving a single lawyer's representation of multiple clients, the Court explained that "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them," and acknowledged that "[n]ot only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized by unregulated multiple representation." 486 U.S. at 160.

Regarding the difficulty of a trial court's task in ruling on whether to allow a waiver of a conflict of interest by a client whose lawyer also represents her/his codefendants, the Supreme Court observed,

> Unfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when the relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials.

22

*Wheat, supra*, 486 U.S. at 162-163. In elaborating on a trial court's oversight powers the Court in *Wheat* also indicated that "the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in the rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Wheat, supra,* 486 U.S. at 163.

Beyond the Supreme Court's recognition of the oversight powers of federal courts in ensuring compliance with the ethical rules in criminal cases, the Federal Rules of Criminal Procedure also assign a role to the Court in ensuring conflict-free counsel. Specifically, Federal Rule of Criminal Procedure 44(c) directs that when "two or more defendants have been charged jointly . . . and [they] are represented by the same counsel," the Court "must promptly inquire about the propriety of joint representation and must advise each defendant of the right to effective assistance of counsel, including separate representation." Fed.R.Cr.P 44(c). Significantly the rule further directs that "[u]nless there is good cause to believe that no conflict of interest is likely to arise, the court must take appropriate measures to protect each defendant's right to counsel."

In *United States v. Garcia*, the Fifth Circuit explained that the standard for waiver of conflict-free counsel is the same as that for waiver of any constitutional right. *Garcia*, 517 F.2d at 275-277. It further explained that the "Supreme Court [had] recognized the need for affirmative judicial involvement in the waiver process" as follows:

> [A] judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such a waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the matter. A judge can make certain that an

23

> accused's waiver of counsel is understandingly and wisely made
> only from a penetrating and comprehensive examination of all the
> circumstances under which such a plea is tendered.

*United States v. Garcia*, 517 F.2d at 277-278, quoting *Von Moltke v. Gillies*, 332 U.S. at 708, 723-

724 (1948).

## VII.   **Recommendation**

At this stage of the case it does not appear possible to determine whether there is an actual

conflict that exists in having the same lawyer represent Messrs. Rae, and Kevin and Nathaniel Tuck

in the above-captioned matter. That said, at this juncture it is impossible to "predict the myriad

paths [this case may] take." *United States v. Carlyle*, 964 F. Supp. at 13. In this case the need to

ensure that the validity of any waiver of the right to conflict-free counsel is particularly supported

by Mr. Pierce's statement to undersigned counsel, in the context of her investigation for the Report

and Recommendation in 21-CR-575, that he was inexperienced in federal criminal practice.[20]

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████ Given that there appear to be possible *Bruton* issues that might give rise to a

severance and that there are possible issues of relative culpability among Mr. Pierce's three clients,

it is critical that any waivers by his clients be clearly established on the record.

As other courts in this district have done, out of an abundance of caution, before inquiring of

each Paul Rae, Kevin Tuck and Nathaniel Tuck about whether he wishes to continue with Mr.

---

[20] It is certainly commendable, as Mr. Pierce explained, that after reviewing the Report and Recommendation
in 21-CR-575, *see* Note 10 (and accompanying text), *supra*, he ███████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████

Pierce as his lawyer, it would be prudent for the Court to appoint an independent "experienced counsel having no stake in an on-going attorney-client relationship or the fees that may be generated therefrom" to advise each about potential conflicts that could arise. *United States v. Carlyle, supra,* 964 F. Supp. at 9, 13 (D.D.C. 1997). *See also United States v. Lopesiera-Gutierrez,* 708 F.3d 193, 199 (D.C. Cir. 2013); *United States v. Lorenzana-Cordon,* 125 F.Supp.3d at 132, 140 (appointing a separate lawyer "'for the limited purpose of advising" the accused about a potential conflict); *United States v. Bikundi,* 80 F.Supp.3d at.15-16 (regarding appointment of "independent and conflict-free counsel" before making a decision regarding waiver of the right to conflict-free counsel). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ This is all the more true given Rule 1.0(e)'s definition of "informed consent." *See* Note 17, *supra.* Appointment of conflict counsel would allow a determination under Rule 1.7(c)(1) that each of Mr. Pierce's clients had been provided sufficient information and explanation about the existence and nature of possible conflicts and the material risks of, and reasonably available alternatives to, having Mr. Pierce represent all three sufficient to allow the Court to make a finding that they have validly waived any actual or potential conflict(s).

Beyond appointing independent conflict counsel for each of Mr. Pierce's three clients, and given the requirements of the law and the unknowns in this case, it would be wise to inquire, independently and on the record of each Paul Rae, Kevin Tuck and Nathaniel Tuck, as well as of John Pierce, about what discussions and explanations of possible conflicts have occurred and about the understanding each has of those potential conflicts and his willingness to waive them.

In making such inquiries of each of Mr. Pierce's clients in this case, it would be advisable to make each inquiry independently of the others, and outside the presence of the other two, and outside of Mr. Pierce's presence. *See Bikundi,* 80 F.Supp.3d at 15 (referring to colloquy between

one codefendant and the court occurring "outside the presence of" the second co-defendant).  It also would make sense for the colloquies between the Court and each of the three, and between the Court and Mr. Pierce, to be under oath.  *See Bikundi*, 80 F.Supp.3d at 15 (referring to the "testimony" of each of the two co-defendants).  In addition, in "engaging in a comprehensive Rule 11-type colloquy" with each, the Court should "'personally and forthrightly advise [each of Mr. Pierce's clients] of the potential dangers of representation by counsel with a conflict of interest.'" *United States v. Carlyle*, *supra*, 964 F. Supp. at 13, n.4 (quoting *United States v. Garcia*, 517 F.2d at 278). Importantly each "must be at liberty to question the [Court] as to the nature and consequences of his legal representation [, and m]ost significantly, the [C]ourt should seek to elicit a narrative response from [each]  . . . that he has been advised of his right to effective representation, that he understands the details of [Mr. Pierce's] possible conflict of interest and the potential perils of such a conflict, that he has discussed the matter with ]Mr. Pierce] . . . or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections.'" *Id.*

Rather than asking questions that require a "yes or no" answer, ideally each of Mr. Pierce's clients ought to explain in his own words how a conflict could arise at each of the stages outlined above, *i.e.*, plea negotiations, pre-trial litigation, trial, and sentencing, were Mr. Pierce to represent more than one of them in the instant case. *See United States v. Garcia*, *supra*, 517 F.2d at 278 ("Mere assent in response to a series of questions from the bench may in some circumstances constitute an adequate waiver, but the court should nonetheless endeavor to have each defendant personally articulate in detail his intent to forego [the] significant constitutional protection" of conflict-free counsel). After each of Mr. Pierce's clients has conferred with an attorney to advise him on the conflict issue and depending on how each answers the questions posed in the colloquy with the Court, the Court should be able to develop a record that can support a finding that any waiver of conflict-free counsel has been established by "'"clear, unequivocal, and unambiguous

language."'" *United States v. Carlyle*, *supra*, 964 F. Supp. at 13, n.4 (quoting *United States v. Garcia*, 517 F.2d at 278).

**Dated: March 31, 2022**                Respectfully submitted,

                                          *s/Santha Sonenberg*
                                          _____
                                          Santha Sonenberg (D.C. Bar No. 376-188)
                                          (202) 494-7083
                                          santhasonenberg@yahoo.com