## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

     -v-

AARON JAMES,

          Defendant.

Case No. 1:21-cr-00605-RC-2

## DEFENDANT AARON JAMES' RESPONSE AND OPPOSITION TO UNITED STATES' MOTION TO REVOKE RELEASE ORDER

John M. Pierce
**JOHN PIERCE LAW P.C.**
21550 Oxnard Street
3rd Floor, PMB 172
Woodland Hills, CA 91367
tel: (213) 279-7846
jpierce@johnpiercelaw.com

*Attorneys for Defendant Aaron James*

## <u>TABLE OF CONTENTS</u>

I.      THE GOVERNMENT'S SPECIFIC ALLEGATIONS ...................................... 2

II.     THE CLAIMS OF "WEAPON" POSSESSION ................................................. 3

III.    ANTIQUE FAMILY HEIRLOOM CIVIL WAR-ERA SHARPENING
        STEELS ...................................................................................................... 5

IV.     THE IVORY HANDLED SHARPENING STEELS ........................................... 6

V.      SUCH CUTLERY ARE NOT CONSIDERED WEAPONS UNDER
        FEDERAL LAW .......................................................................................... 7

VI.     "A REPLICA GUN IN HIS BASEMENT DWELLING" ................................... 9

VII.    REVOCATION CANNOT BE BASED ON PERCEIVED
        NONCOMPLIANCE OF AMBIGUOUS COMMANDS ................................. 11

VIII.   CLAIMS THAT AARON JAMES OBSTRUCTED OR DELAYED
        INSPECTION EVAPORATE UPON SCRUTINY .......................................... 12

IX.     PRETRIAL RELEASE CANNOT BE REVOKED FOR "THREATS" TO
        PURSUE LEGAL REMEDIES OR INSIST ON PROPER LEGAL
        TREATMENT ............................................................................................. 12

X.      THE GOVERNMENT'S TOTALLY BASELESS CLAIMS THAT
        JAMES IS A THREAT TO THE COMMUNITY AT LARGE ........................ 14

XI.     EVEN IF THE GOVERNMENT'S CLAIMS OF VIOLATIONS WERE
        TRUE, THE GOVERNMENT'S REVOCATION MOTION MUST BE
        DENIED BASED ON §3142 GROUNDS ....................................................... 15

XII.    CONCLUSION ............................................................................................ 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Fischer,*
   501 B.R. 346 (B.A.P. 8th Cir. 2013) ........................................................................ 11

*FTC v. Leshin,*
   618 F.3d 1221 (11th Cir. 2010) ............................................................................... 12

*Imageware, Inc. v. U.S. W. Commc'ns,*
   219 F.3d 793 (8th Cir. 2000) ................................................................................... 11

*Int'l Bhd. of Electr. Workers, Local Union No. 545 v. Hope Electr. Corp.,*
   293 F.3d 409 (8th Cir. 2002) ................................................................................... 12

*In re Reed,*
   888 F.3d 930 (8th Cir.) ............................................................................................ 11

*Riccard v. Prudential Ins. Co.,*
   307 F.3d 1277 (11th Cir. 2002) ............................................................................... 12

*Scott v. United States,*
   243 A.2d 54 (D.C. 1968) ............................................................................................ 8

*State v. Harwood,*
   238 A.3d 661 (Vt. 2020) ........................................................................................... 13

*Taylor v. United States,*
   848 F.2d 715 (6th Cir. 1988) ..................................................................................... 7

*United States v. Broadie,*
   452 F.3d 875 (DC Cir. 2006) ................................................................................. 7, 8

*United States v. Hanson,*
   613 F. Supp. 2d 85 (D.D.C. 2009) ............................................................................ 1

*United States v. Hassanshahi,*
   989 F. Supp. 2d 110 (D.D.C. 2013) ........................................................................... 1

*United States v. Laroche,*
   723 F.2d 1541 (11th Cir. 1984) ............................................................................... 10

*United States v. Mayo,*
   705 F.2d 62 (2d Cir. 1983) ...................................................................................... 10

*United States v. Salerno,*
    481 U.S. 739 (1987) ................................................................................ 1

*United States v. Vinton,*
    594 F.3d 14 (D.C. Cir. 2020) ................................................................. 7

*Virginia v. Black,*
    538 U.S. 343 (2003) ............................................................................. 14

**Statutes**

16 U.S.C. § 4223 ........................................................................................ 6

18 U.S.C. § 921 .................................................................................... 4, 10

18 U.S.C. § 3142 ..................................................................................... 15

18 U.S.C. § 3148 ....................................................................................... 1

**Local Rules**

D.C. Code § 22-4504 ................................................................................. 8

**Other Authorities**

Convention on International Trade in Endangered Species ("CITES"),
    July 1, 1975, 50 C.F.R. § 23.23 (1989) ................................................. 6

COMES NOW Defendant AARON JAMES, by and through counsel, with this response and opposition to the UNITED STATES' MOTION TO REVOKE RELEASE ORDER filed on July 15, 2022 (Doc. #62).  Every claim for revocation and arrest therein is false, exaggerated, deceptive, or groundless in one way or another.

The United States invokes 18 U.S.C. § 3148(b) in its efforts to revoke.  That subsection provides that revocation may occur where, after a hearing, a court finds (A)probable cause that the person has committed a crime while on release; or (B)clear and convincing evidence that the person has violated any other condition of release. In this case, the government does not allege that AARON JAMES has committed any crimes.  Rather, the government seeks to cobble together a few pictures of antique knife sharpening tools, a reference to a toy cap gun, and reports that probation officers felt threatened during visits to Mr. James' residence.

Subsection (2)(B) provides that a rebuttable presumption favoring revocation exists where a supervisee committed a Federal, State, or local felony.  But under the 8th amendment, when the government alleges mere violations of conditions, the presumption is in favor of continued release. *See United States v. Hassanshahi*, 989 F. Supp. 2d 110 (D.D.C. 2013) ("Our system of criminal justice embraces a strong presumption against detention." *United States v. Hanson*, 613 F. Supp. 2d 85, 87 (D.D.C. 2009). "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The Bail Reform Act requires that the Court release a defendant if

1

there are release conditions that reasonably assure that the individual will not present a flight risk or a danger to the community.

## I.   THE GOVERNMENT'S SPECIFIC ALLEGATIONS

The government alleges "multiple violations of the conditions of [Mr. James'] pre-trial release," including "continued possession of three knives with blades of over six inches and a replica gun in his basement dwelling," "refusal to comply with the Officer's instructions . . . to get rid of his weapons within 24 hours," "combative and threatening conduct toward Pretrial Services officers," and "interference with the officers' supervision of co-defendants." An evidentiary hearing will establish that none of these claims are true or accurate.  Moreover, even if the claims were true, they simply do not constitute grounds for revocation of James' pre-trial release.

The government's motion contains a number of paragraphs describing the government's allegations against Aaron James and the three other members of the Westbury family. Suffice it to say that the government's depiction and version of events is highly imaginary.  James and his family are presumed innocent, and they expect to be acquitted of every count at trial.

Page 2 of the government's motion contains the following interesting paragraph:

> James, who seems to want to dictate the terms of his own release, has shown contempt for this Court's directives, has made Pretrial Services understandably concerned for officer safety, and has made nearly impossible the continued supervision of his co-defendants (and their own compliance with the terms of their release). He remains in violation of his terms of release and presents a danger to

> the community that no conditions will adequately mitigate.
> Accordingly, the Court should issue a warrant for the
> defendant's arrest and detain him pending sentencing.

(Apparently the Department of Justice views sentencing as a given; trials or jury determinations seem quaint, old fashioned or even irrelevant in the eyes of the government.)

Many of the government's assertions are subjective.  Concepts such as "*understandably concerned* for safety," "*seeming* to want to dictate terms," and "making it *nearly* impossible . . ." are difficult to measure or qualitatively assess. Other allegations are wholly conclusory (e.g., "shown contempt," "remains in violation of his terms," and "presents a danger").  But to the extent that the motion describes alleged bright-line fact-based claims, those claims are provably, demonstrably false (e.g., the assertion of weapon possession, which will be addressed below).

If the defendant had truly "shown contempt for the Court's directives" or "presents a danger to the community that no conditions will adequately mitigate," one would expect to see actual, bright-line violations such as crossing state or international borders without permission," ingesting illegal drugs, or committing acts of violence or property crimes against those around him.  There is no hint whatsoever of such a level of "contempt for the Court's directives."

## II.    THE CLAIMS OF "WEAPON" POSSESSION

If Mr. James actually violated his terms by possessing weapons, one would expect descriptions or details of these violations and these weapons on page 1.  But one must read to page 6 to get any details:

> Already on October 20, 2021, James was in possession of a number of items considered by his Pretrial Services Officer to be weapons. He possessed a pellet gun, an antique firearm, a compound bow and arrows, a shotgun shell, multiple bladed weapons, and several "buck knives." ECF No. 25 at 2. Because the Officer <u>deemed those items to be weapons</u> raising serious concerns about officer safety, he directed James to get rid of all weapons within 24 hours and to <u>properly store all knives that serve a purpose other than as a weapon</u>. *Id*. James indicated that he understood and intended to comply. *Id*. At a hearing before the Court on October 29, 2021, counsel for James confirmed that James would comply or had complied and there was no further dispute for the Court's consideration. *See* generally Minute Entry, 10/29/21.
>
> However, James did not comply. On February 15, 2022, the Pretrial Services Officer observed some of the same knives on a shelf in James's bedroom area.

(emphasis added.)

There is hardly an item among the government's listed 'weapons violations' that constitutes an actual, recognized firearm or weapon under federal law.  Shotgun shells are explicitly excluded from the definition of firearms provided in 18 U.S.C. § 921(a)(4)(B).  The pellet gun and the compound bow and arrows have already been dealt with by this Court in prior proceedings.  (In any case, Mr. James quickly removed those items; and the Court did not revoke James' pretrial release regarding them.)  The Westburys live in rural Minnesota, where hunting instruments, shotgun shells, bows and arrows and pellet guns are prevalent (non-weapon) accessories in many vehicles and households.

### III.   ANTIQUE FAMILY HEIRLOOM CIVIL WAR-ERA SHARPENING STEELS

Aaron James reports that probation officers never complained about the ivory handled sharpening steels near his bedstand in their initial visits.  The items were made the subject of discussion only during a visit in February of this year.

And according to the government's own report, Mr. James was never told to get rid of all knives, or to store all knives in a secure location, or even to properly store all knives in the kitchen.   Rather, the probation officer told the defendant to make a determination, and to "properly store all knives that serve a purpose other than as a weapon."  It was plainly left to Mr. James to determine which objects in his domicile are knives and of those, which are knives that serve a purpose other than as a weapon.  From there, Mr. James was told only to "properly store" such "knives that serve a purpose other than as a weapon."  This is according to the government's own report (and Mr. James remembers the instructions slightly differently—which is to say, he recalls the probation officers expressing no strong disapproval of the antique cutlery until the very most recent visits, whereupon the probation officers seemed to dramatically depart from their prior stance.

By the probation officer's own admission, James was given no instruction whatsoever to remove the "knives" displayed on Mr. James' bedroom furniture.  Yet the government's motion proclaims that "However, James did not comply. On February 15, 2022, the Pretrial Services Officer observed some of the same knives on a shelf in James's bedroom area."

## IV.   THE IVORY HANDLED SHARPENING STEELS

The alleged "knives" in question are, in fact, antique family heirlooms manufactured in the nineteenth century.  Properly speaking, they are sharpening steels and not knives at all.  They are ivory handled, which means that their possession is subject to federal regulations under the Endangered Species Act, the African Elephant Conservation Act, 16 U.S.C. § 4223(1), and the Convention on International Trade in Endangered Species ("CITES"), July 1, 1975, 50 C.F.R. § 23.23 (1989).  Such ivory cannot be sold or transported across international borders and are subject to other commercial limitations.  However, because the cutlery are family heirlooms from the nineteenth century, Mr. James' ownership and possession of them is protected under 'grandfather' exception clauses.



Because the steels are antique collectibles, James cannot store them in the household kitchen area where they might be mistakenly used as kitchen utensils or mixed in with other silverware.  The family intends to display these Civil War era collectors' items properly in the future.  However, the home is currently undergoing some renovations, and the items are on display in an imperfect fashion on bookshelves.

## V.   SUCH CUTLERY ARE NOT CONSIDERED WEAPONS UNDER FEDERAL LAW

Of course, even if the objects <u>were</u> knives, they are generally not considered weapons under federal law.  In *United States v. Vinton*, 594 F.3d 14, 22-23 (D.C. Cir. 2020), the D.C. Circuit distinguished between knives which are inherently intended for use as weapons and those which are not.  Judge Brown found that "[t]he design of a <u>butterfly knife</u> makes it principally useful as an easily concealable and quickly deployable weapon capable of injuring another person in an altercation at close range," *citing Taylor v. United States*, 848 F.2d 715, 716, 720 (6th Cir. 1988) (butterfly knives are "most often associated with the martial arts and with combat . . . [and are] potentially dangerous, lethal" weapons that "can be opened very rapidly, perhaps in less than 5 seconds").  Judge Brown wrote that the distinguishing features of such a knife, described in an unpublished 2006 opinion, involved the user releasing "one of the halves of the handle and through a combination of gravity and centrifugal force, the latter generated by a movement of the arm or wrist, the wielder swings that half of the handle around until it meets the other half. These forces also swing the blade into position."

Such distinguishing features of a "butterfly knife," according to the D.C. Circuit, gave arresting officers suspicion that they might find other weapons in a person's vehicle and helped form probable cause for a more in-depth search of the vehicle.  *Id.*

 Similarly, in another case, *United States v. Broadie*, 452 F.3d 875, 881-82 (DC Cir. 2006), the D.C. Circuit considered whether D.C. police had probable cause to

detain someone carrying an "ASP baton" under a D.C. Code provision (§ 22-4504(a)) that prohibits carrying a dangerous weapon.   In dicta, Judge Ginsberg discussed attributes of knives which might make them fall under the designation of a "dangerous weapon.":

> In the District of Columbia, a "dangerous weapon" is anything that is "likely to produce death or great bodily injury by the use made of it." *Strong v. United States*, 581 A.2d 383, 386 (D.C. 1990) (quoting *Scott*, 243 A.2d at 56). An object is "likely to produce great bodily injury" if: (1) the design of the object is such that in its ordinary use it is likely to cause great bodily injury; or (2) the surrounding circumstances indicate that an object capable of causing great bodily injury is likely in fact so to be used. For example, some items, "*such as particularly menacing knives*, have been held to be inherently dangerous," *id.*, that is, "dangerous in its ordinary use as contemplated by its design and construction," *Scott*, 243 A.2d at 56. But "all knives are not per se dangerous . . . [because a] knife may be used as a tool in certain trades or hobbies or it may be carried for utilitarian reasons." *Id.* An object that is not "inherently dangerous can become dangerous by its use as a weapon." *Strong*, 581 A.2d at 386; *see also Scott*, 243 A.2d at 56 (an instrument may be dangerous "where the purpose of carrying the object, under the circumstances, is its use as a weapon").

*Broadie*, 452 F.3d at 881-82 (emphasis added).

Note that in the *Scott v. United States* case, 243 A.2d 54 (D.C. 1968) case, relied on by the *Broadie* Court, the Court of Appeals wrote that:

> This court has previously held that <u>all knives are not per se dangerous weapons</u>. *Degree v. United States*, D.C. Mun. App., 144 A.2d 547 (1958). A knife may be used as a tool in certain trades or hobbies, or it may be carried for utilitarian reasons. Section 22-3204 does not prohibit the carrying of such instruments for a legitimate purpose. The statute, as we interpret it, outlaws the carrying of an otherwise    useful    object    where    the    surrounding

> circumstances, such as the time and place the defendant
> was found in possession of such an instrument, or the
> alteration of the object, indicate that the possessor would
> use the instrument for a dangerous purpose.

*Scott*, at 56.

In the instant case of Aaron James, a handful of 'knife-like' sharpening steels simply do not qualify as weapons under federal law, as described above.  Nor do the items' position near James' bed earlier this year give rise to any interpretation that they might be used as weapons in any sense.  (In any case, James has now removed the items from the bookcase.)

## VI.   "A REPLICA GUN IN HIS BASEMENT DWELLING"

The government references, on its first page, the alleged "continued possession" by James "of . . . a replica gun in his basement dwelling."  Although the government proclaims (in the most passing way) such "replica gun" possession is one of "multiple violations of the conditions of his pre-trial release," the government thereafter says nothing about this alleged "violation."  Perhaps the government fears mockery or even formal sanctions by the Court.

It is difficult to imagine a more frivolous or comedic allegation being lodged in any federal court.  The "replica gun" referenced as a violation of James's conditions is plainly a child's toy cap gun. By no stretch of the imagination—let alone federal law—could possession of such an obvious toy "replica" be grounds for imprisoning an unconvicted American pending trial in the face of the 8th amendment.

 



18 U.S.C. § 921(a) (3)(D) defines the term "firearm" to "not include an antique firearm."  It is well settled that possession by a felon of an antique firearm is not a federal offense, *see United States v. Laroche*, 723 F.2d 1541 (11th Cir. 1984); *United States v. Mayo*, 705 F.2d 62 (2d Cir. 1983).  But in Aaron James' case, the "replica" wasn't even an actual replica or an antique firearm; it was a child's toy.  Any toy which is not "designed to or may readily be converted to expel a projectile by the action of an explosive" is not a firearm.  No reasonable probation officer could make such a mistake of fact in good faith.

## VII.   REVOCATION CANNOT BE BASED ON PERCEIVED NONCOMPLIANCE OF AMBIGUOUS COMMANDS

Defendant James did in fact comply with his probation officer's command to "properly store all knives that serve a purpose other than as a weapon." From the first meeting with probation officers at his residence, Mr. James removed all items which were commanded to be removed. The original October 20, 2021 command by the officer had not included the antique cutlery and family heirloom sharpening steels. No reference to the cutlery was made during the February 2022 visit.

And, after the February visit, James did in fact remove the actual knives in the collection from his bedside bookshelf. James now recognizes that there is a dispute regarding interpretation of James' conditions between himself and certain probation officers. Out of respect for the Court and the US probation office, James has now removed all the ivory-handled items—including forks—from the bookshelf.

Given the ambiguous commands described in the government's own motion, Mr. James' approach <u>cannot be considered noncompliance</u>. "[N]o one should be held in contempt for violating an ambiguous order; a finding of contempt should be clear and certain." *In re Fischer*, 501 B.R. 346, 350 (B.A.P. 8th Cir. 2013) (citing *Imageware, Inc. v. U.S. W. Commc'ns*, 219 F.3d 793, 797 (8th Cir. 2000)). "A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *In re Reed*, 888 F.3d 930, 936 (8th Cir.) (citation omitted). "If the underlying order contains no operative commands, only abstract legal conclusions or compels no action then a finding of contempt is not warranted. *Fischer*, 501 B.R. at

350 (citing *Int'l Bhd. of Electr. Workers, Local Union No. 545 v. Hope Electr. Corp.*, 293 F.3d 409, 418 (8th Cir. 2002)); *FTC v. Leshin*, 618 F.3d 1221, 1232 (11th Cir. 2010) (contempt proceedings for noncompliance with orders must be supported by clear and convincing evidence that "the allegedly violated order was valid and lawful; . . . the order was clear and unambiguous; and the . . . alleged violator had the ability to comply with the order" (citing *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (11th Cir. 2002)).

## VIII.   CLAIMS THAT AARON JAMES OBSTRUCTED OR DELAYED INSPECTION EVAPORATE UPON SCRUTINY

The government's motion continues with claims that Aaron James "delayed the officers' review of the basement for a significant amount of time" during a June 17, 2022 visit by Pretrial Services.  The government also claims that James acted in a combative or threatening manner during the same visit.

In fact, James merely informed probation officers that his girlfriend was dressing in the downstairs area.  According to James this "delay" was hardly significant and could not have been more than a minute or two.

## IX.   PRETRIAL RELEASE CANNOT BE REVOKED FOR "THREATS" TO PURSUE LEGAL REMEDIES OR INSIST ON PROPER LEGAL TREATMENT

The government's motion accuses the defendant of being confrontational and making threats to probation officers On June 17, 2022—more than a month ago; yet the officers did not report such alleged threats until the July 15 filing.

But a cursory examination of the alleged threats described in the government's own motion reveals that Mr. James' alleged statements weren't threats at all, in any

legal sense.  At most, Mr. James' reported remarks (e.g., "are you going to yell at me for my cutlery again?," "you tried to put me in jail over some knives," and "you are in my house") illustrate frustrated, uncomfortable, or nervous small talk of the kind that is typical of supervisees during high-stakes inspections.[1]  While the officer "concluded that James was agitated and taking an inappropriate and threatening tone and physical posture," a reasonable interpretation of Mr. James' conduct is that James was expressing simple frustration over what James felt were the officer's sudden overzealousness regarding trivial matters.

Mr. James has provided a walk-through video of the setting.  It is evident that open spaces and passageways throughout the domicile are somewhat filled with boxes and other household items as the home is undergoing renovation.  Mr. James states that, during the visit, he was simply positioned above the stairs with limited space available to move out of the way.  James has also provided a letter indicating that he has respect for the officers and had no intention to appear confrontational during the recent visit.

Verbal statements to a correction officer must be intended to place the officer in fear of harm and to coerce the officer in order to be considered unlawful threatening. *State v. Harwood*, 238 A.3d 661 (Vt. 2020).

---

[1] A reasonable person might wonder what a supervisee might be expected to say upon the first home visit from probation officers who previously sought to jail the supervisee over what some observers (including this Court) regarded as exaggerated claims.  Did officers expect James to be silent regarding the matter?  In light of the obvious disagreement of assessments regarding such matters, James' reported remarks seem almost designed to relax the tension of the moment, while probation agents unprofessionally sought to escalate hostility.

More concerning is the government's attempt to jail an American citizen for merely verbally challenging a probation officer's legal interpretation of terminology.

According to the government's motion, "When the Officer asked James why he had not removed the weapons, James responded, 'if you want to call those weapons you can tell DC about it and see what they say.' (United States Mot., p. 7). The United States regards such a challenge to seek a legal opinion from "DC" to be a threat. A long line of first amendment cases regarding "true threats" protects speech which merely questions the construction of a statute. *See, e.g.*, *Virginia v. Black*, 538 U.S. 343, 359 (2003). The Supreme Court has said that "'[t]rue threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.*

## X.   THE GOVERNMENT'S TOTALLY BASELESS CLAIMS THAT JAMES IS A THREAT TO THE COMMUNITY AT LARGE

Outlandishly, the government sums up its motion with a flurry of excited rhetoric, claiming that

> James's conduct, coupled with his prior violations of his conditions of release, shows that no condition or combination of conditions can adequately protect the public from the defendant, and warrants immediate action by the court through the issuance of an arrest warrant. Pretrial Services cannot safely supervise Aaron James, Robert Westbury, or Isaac Westbury while James remains in the Westbury home. Anything short of detention would endorse James's strategy of blatantly violating the terms of his supervision in order to rid himself of such supervision. And this Court's dedicated Pretrial Services officers should not be required to risk harm so that James can remain in his parents' basement pending trial.

Government's motion, p. 11.

## XI.   EVEN IF THE GOVERNMENT'S CLAIMS OF VIOLATIONS WERE TRUE, THE GOVERNMENT'S REVOCATION MOTION MUST BE DENIED BASED ON § 3142 GROUNDS

Defendant Aaron James has a clean record.  He is a decorated U.S. Navy veteran, honorably discharged.  He was a corpsman attached to a Marine Unit.  The only sailors regularly and routinely attached to the Marine Units are Hospital Corpsman with the Fleet Marine Force, who the Marines absolutely love and treat as one of their own. Mr. James is a trained professional first responder and EMT.  With the exception of the allegations in this indictment, Mr. James has never been accused of being a danger to the public in any sense.  (And Mr. James is presumed to be entirely innocent of the indictment under the law.)

The defendant has been on pre-trial release since the date of his arraignment. He has attended every hearing and responded to every motion.

Even if the government's claims of violations were true, Section 3142 requires that a pretrial defendant may only be committed to pretrial incarceration only if the Court (2) finds that—

> **A.**   **based on the factors set forth in section 3142(g) of this title, there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or**
> **B.**   **the person is unlikely to abide by any condition or combination of conditions of release.**

Defendant submits that under no stretch of the imagination has the United States shown information that might cause any court to conclude that Mr. James

might flee or pose any danger to the safety of anyone.  Nor is there any suggestion

(outside the government's conclusory motion) that Mr. James might be unlikely to

abide by any condition or combination of conditions.

## XII.    CONCLUSION

Accordingly, the defendant asks this Court to DENY the motion of the United

States to revoke the defendant's pre-trial release.

Dated: July 22, 2022                     Respectfully submitted,


                                         /s/ John M. Pierce
                                         John M. Pierce
                                         **JOHN PIERCE LAW P.C.**
                                         21550 Oxnard Street
                                         3rd Floor, PMB 172
                                         Woodland Hills, CA 91367
                                         tel: (213) 279-7846
                                         jpierce@johnpiercelaw.com

                                         *Attorneys for Defendant Aaron James*

## **ATTACHED EXHIBITS**

1.  Handwritten letter by Aaron James

2.  Appraisal of the cutlery at issue in this case

3.  Screenshot(s) of the toy cap guns available on ebay, etc.

4.  Aaron James Video

# EXHIBIT 1

To the honorable courts

I am writing this letter to express my great respect and admiration for this institution. I would like to apologize to the judge and the courts if my frusteration has been viewed as anything but frustration. I apologize if my behavior has come across at anytime as disresptful or threatening in anyway. I have done everything in my power to comply with my terms stipulated by the courts. The situation has been long and intrusive without clear guidance. My frustration is not directed towards anyone, just the situation as a whole. I apologize if I have come across in anyway other than that. I will make a concerted effort to be mindful of behaviors during interactions with any court appointed persons.

Sincerely,

# EXHIBIT 2

## Object Identification and Appraisal for Antiques & Historical Items

*\* includes paintings, sculptures, watercolors, prints, drawings, ceramics, antiques, decorative arts, textiles, carpets, silver, rare manuscripts, historical memorabilia, and other similar objects.*

**VALUATION EFFECTIVE DATE:  7/18/2022**

**FAIR MARKET VALUE: $ 150.00 - 200.00**

**ARTIST:**             Harrison Bros. & Howson Sheffield

**DESCRIPTION:**     19th Century Sheffield, England Harrison Bros. & Howson Sterling Silver Mounted Ivory Handled Carving Set.

- 1773
- Sterling Silver mounted in Ivory
- Makers Mark HH
- Sterling   Silver   Mounted   Ivory   Handled Carving   Set.

**PROVENANCE:  None: Passed down from Ancestors**

**LITERARY  REFERENCES/CATALOGUE  RAISONNÉ:  CONDITION:  Fair**

**ACQUISITION COST, DATE AND SOURCE:** None, 2010, Passed down from

Ancestors

## APPRAISED VALUE SUPPORT: $ 150.00 - 200.00, Not a complete set, Age Splits to Ivory Handles, Moderate Corrosion to one stainless steel blade

**AUCTION OR PRIVATE SALES:**

**PRICE**                  **SALE, LOCATION, DATE, LOT #**
For example:

$468.00             https://www.kodner.com/auctions/2016/08/10/
                          fine-art-antiques-and-estate-jewelry/204

**DESCRIPTION** 19th Century Sheffield, England Harrison Bros. & Howson Sterling Silver Mounted Ivory Handled Five (5) Piece Carving Set in Fitted Box.

**REASONING FOR APPRAISED VALUE:**

These items have significant wear and some corrosion. Ivory handles have some splitting, and the set is incomplete, which has harmed the value of the items. Complete sets have sold for double in better condition, shown in link.

**Note:** It is understood that complete information will not be readily available in every case.

# EXHIBIT 3

🔒 🔍 toy gun "pony boy"

**All**   Shopping   Images   Videos   News   Maps   B



🛍️ eBay                                ⋮

Vintage Die Cast Metal
Tootsie Toy Pony Boy Cap
Gun with Orange Plug…

$35



🛍️ eBay                                ⋮

Vintage Die Cast Tootsie Toy
PONY BOY Cap Gun Metal
Cowboy Pistol White Handle

$25



🅱️ Ron Peterson Antiques    ⋮

Pony Boy Cap Gun

$10

🅰️ Amazon.com                        ⋮

vintage Pony Boy Cap Gun
Toy Cast Pistol



🛍️ eBay                                ⋮

Vintage Diecast "Pony Boy"
Cap Gun | eBay

$30



🛍️ eBay                                ⋮

Vintage Pony Boy Toy Cap
Gun Pistol | eBay

$13

# Exhibit 4

# Aaron James Video

**Can be accessed here:**

**https://www.dropbox.com/s/l3gd3la11pqc8zw/Aaron%20James%20Video.mp4?dl=0**

## **CERTIFICATE OF SERVICE**

I hereby certify that, on July 22, 2022, this motion and the accompany

exhibits were filed via the Court's electronic filing system, which constitutes service

upon all counsel of record.

/s/ John M. Pierce
John M. Pierce