UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| v. : | **Case No. 1:21-cr-605(2) (RC)** |
| **AARON JAMES, &** : | |
| **ISAAC WESTBURY,** : | |
| **Defendants.** | |

DEFENDANTS AARON JAMES' AND ISAAC WESTBURY'S MOTION FOR BILL OF PARTICULARS REGARDING COUNTS 2, 3, 5 AND 7 TO SUPPORT A LIKELY MOTION TO DISMISS ON GROUNDS THAT THE "WEAPON" DESCRIBED (A "LAW ENFORCEMENT SHIELD") DOES NOT QUALIFY AS A "DEADLY AND DANGEROUS WEAPON" IN THE MANNER ALLEGED BY THE UNITED STATES

COMES NOW Defendants AARON JAMES and ISAAC WESTBURY, by and through counsel, with this motion for a Bill of Particulars regarding counts 2, 3, 5, and 7, pursuant to Fed. R. Crim. P. 7(f). Defendants cannot be convicted of these weapons counts for merely holding or otherwise using a "law enforcement shield" in a normal manner—as a shield is a defensive object in its intended use, rather than a "deadly and dangerous weapon."

(Defendants do not contest that it is <u>conceivably possible</u> for a shield to be used as a "deadly and dangerous weapon" in a given case; for example, where an assailant thrusts the sharp end of such a shield at a victim's head or throat. However, upon information and belief, the United States does not allege such use by the defendants; and thus these "deadly and dangerous weapon" counts must be dismissed rather than waste the Court's time and resources.)

We therefore pray for an order requiring the government to provide a bill of particulars detailing with particularity how the government contends the defendants "used" the "law

enforcement shield" in question. We expect this bill of particulars to lead to dismissal of these counts on grounds that the "deadly and dangerous weapon" described in the indictment ("a law enforcement shield") simply does not qualify as a deadly and dangerous weapon when used in a normal sense.

## INTRODUCTION

Aaron James and Isaac Westbury ("Aaron" and "Isaac") are brothers charged in **Count two** with assaulting a federal officer with a "deadly and dangerous weapon, that is, a law enforcement shield." **Count three** charges them with entering a restricted area where the vice president was visiting while carrying and using the "deadly and dangerous weapon, that is, a law enforcement shield." **Count five** again charges them with disorderly conduct in a restricted area where the vice president was visiting while carrying and using the "deadly and dangerous weapon, that is, a law enforcement shield." Again in **Count Seven**, the two defendants are charged with engaging in violence at the Capitol while using "a deadly and dangerous weapon, that is, a law enforcement shield."

A "law enforcement shield"—even if used to contact or even if pressed against an opposing person or federal officer—cannot be a "deadly and dangerous weapon" unless it is used in an extremely unusual manner. Thus, the indictment might as well claim that Aaron and Isaac committed disorderly conduct in a restricted area with ball point pens in their pockets, or that Aaron and Isaac engaged in violence at the Capitol while carrying lunchboxes, etc., etc.

Under no interpretation of federal law can a "law enforcement shield," used as intended by its manufacturer, be "a deadly and dangerous weapon"—at least unless the indictment alleges that Aaron and Isaac used or deployed the shield in a weaponlike manner of some kind by striking or

bludgeoning someone with it.  A shield is plainly a tool of *defense and protection* rather than a weapon for offense.[1]

**A Bill of Particulars will illustrate that the government's weapons counts must be dismissed.**

Federal Rule of Criminal Procedure 7(c) provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged..." Fed. R. Crim. Proc. 7(c). Under Rule 7(f), "[t]he court may direct the government to file a bill of particulars." *Id.* at 7(f). "A bill of particulars can be used to ensure that the charges brought against a defendant are stated with enough precision to allow the defendant to understand the charges, to prepare a defense, and perhaps also to be protected against retrial on the same charges." *United States v. Butler*, 822 F.2d 1191, 1193 (D.C. Cir. 1987).

In this case, where an obvious non-weapon is alleged to be a "deadly and dangerous weapon" by the United States (repeatedly, in multiple counts), the United States must be required to state its theory of how the facts might lead to conviction for such crimes. Otherwise, if the government accuses Aaron and Isaac of merely using a shield in a 'normal' manner—e.g., by simply holding it or even pressing it—these counts must be dismissed.  A bill of particulars would greatly aid in the efficient disposition of the indictment. Cf., *Campbell v. Amtrak*, 309 F.R.D. 21 (D.DC 2015) (a court may order dismissal when proceedings would require the court to expend considerable judicial resources in the future in pursuit of foregone conclusion).

---

[1] Indeed, the iconic theme of 'shield as opposed to a sword' appears throughout federal law, illustrating that a shield is universally recognized—even in metaphor—as a defensive item; not a weapon. See, e.g., *Colonial Funding Network, Inc. v. Epazz, Inc.*, 252 F. Supp. 3d 274, 285 (S.D.N.Y. 2017) (noting that the doctrine of unconscionability of contract enforcement may only be used as a shield, not as a sword); *GAB Business Services, Inc. v. Syndicate 627*, 809 F.2d 755, 762 (11th Cir. 1987) (attorney-client privilege" 'was intended as a shield, not a sword'");  *City of Saint Paul v. Evans*, 344 F.3d 1029, 1033 (9th Cir. 2003) ("a statute of limitations should be used only as a shield, not as a sword").

**A bill of particulars is necessary for Isaac and Aaron to defend themselves from the indictment.**

In this case, without additional facts which show the government's theory of the case, Aaron and Isaac cannot adequately prepare their defense. Rule 7(c) requires an indictment, among other things, to be a "plain, concise, and definite" "statement of the essential facts. . ." Here, upon information and belief, the government's (hidden) "essential facts" would result in dismissal, or acquittal, of Aaron and Isaac on the weapons counts, and/or reversal of any wrongful conviction(s) rendered by a D.C. jury. The law does not permit the United States to 'hide the ball' in indictments in this way as leverage in plea negotiations. Cf., *United States v. Pfingst*, 477 F.2d 177 (2nd Cir. 1973) (a prosecutor has a duty to reveal matters to the court which are relevant to proper sentence whether or not favorable to the defendant).

Defendants ask for the following details in a bill of particulars:

**A) How, precisely, does the United States allege that Aaron and Isaac used a law enforcement shield as a deadly and dangerous weapon on Jan. 6?**

Without such particulars, Aaron and Isaac cannot adequately prepare for trial. At present, without more detail, there appear to be three possibilities regarding the indictment:

Either,

(1) The United States is seeking to <u>change</u> federal law, by alleging that mere use of a shield in a normal manner while touching or briefly pressing such a shield against federal officers constitutes an assault or attack on federal officers;

(2) The United States is alleging that Aaron and Isaac actually bludgeoned or struck federal officers with the sharp end of a shield, consistent with using a deadly and dangerous weapon.

(3) The United States is seeking to <u>change</u> federal law, by alleging that merely holding or advancing with a "law enforcement shield" in a normal or even aggressive manner in a time

or place the government regards as restricted constitutes the federal crimes listed in the indictment.[2]

For obvious reasons, defendants need these particulars in order to prepare for cross-examination, to prepare Rule 29 motions, to prepare research briefs, etc. A Bill of Particulars is especially pertinent where a defendant's guilt depends so crucially upon the fact in question. Cf. *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976)).

**A shield is plainly a defensive rather than an offensive object.**

Additionally, a search of federal case law finds no other case (prior to Jan. 6) in which anyone has been prosecuted for aggravated assault with a "deadly and dangerous weapon" where the alleged "deadly and dangerous weapon" was a shield. (Note that the government appears to be trying to use the January 6 cases to drastically expand the scope and reach of federal criminal law and is currently charging several Jan. 6 defendants for using gloves, flagpoles, and other harmless objects as "deadly" weapons. See, e.g., *United States v. Klein*, 533 F. Supp. 3d 1 (DCDC 2021) (another Jan. 6er prosecuted for using a plastic shield as a "deadly and dangerous weapon")).

In *Klein*, Judge Bates offered some doubtful thoughts about Klein's ultimate criminal liability for merely pushing a plastic shield against police officers on January 6.   "This Court agrees with the weight of authority that "[a] defendant who acts 'forcibly' using a deadly or dangerous weapon under

---

[2] Note that there are Second Amendment implications to the indictment, if the government uses the indictment in this way.  The Supreme Court recently expounded on the right to carry arms in public, in the case of *N.Y. State Rifle & Pistol Ass'n v. Bruen*.  In *Bruen*, the Court held that the Second Amendment protects the right of an American to carry defensive arms in public places. 142 S. Ct. 2111 (June 23, 2022).  The *Bruen* decision is directly on point on the question of whether a person can be prosecuted for mere carrying of an item in self defense in a public area. Thus, even if the allegations here were proven true, and even if a "law enforcement shield" were considered a type of "arms," the mere use and carrying of such a shield in a normal manner cannot subject a person to criminal punishment.

§ 111(b) must have used force by making physical contact with the federal [officer], or at least threatened the [officer], with an object that, <u>as used, is capable</u> of causing great bodily harm." *Klein*, at 10 (citing *United States v. Taylor*, 848 F.3d 476, 494 (1st Cir. 2017).

<u>*Klein* is a sister case to this case</u>, as Klein is—like Aaron and Isaac—charged with aggravated assault on federal officers "using" a plastic shield in the tunnel area of the Capitol. Judge Bates (during proceedings on Klein's detention status) briefly assessed the government's assertion that Klein's alleged act of aggressively pressing a shield against an officer constitutes "aggravated assault" with a "deadly and dangerous weapon."

In footnote 6 of Bates' published decision to release Klein, Bates expressed "some doubts about whether Klein "used" the stolen riot shield as a dangerous weapon." "The BRA [Bail Reform Act] does not define the term," wrote Bates, "but at least for purposes of § 111(b), courts have held that a dangerous weapon is any "object that is either inherently dangerous or is used in a way that is likely to endanger life or inflict great bodily harm" (citing *United States v. Chansley*, 2021 U.S. Dist. LEXIS 43000, 2021 WL 861079, at *7 (D.D.C. Mar. 8, 2021) (Lamberth, J.) (collecting cases)).

> A plastic riot shield is not an 'inherently dangerous' weapon, and therefore the question is whether Klein used it in a way 'that is likely to endanger life or inflict great bodily harm.' The standard riot shield "is approximately forty-eight inches tall and twenty-four inches wide," see Gov't's Br. at 13, and the Court disagrees with defense counsel's suggestion that a riot shield might never qualify as a dangerous weapon, even if swung at an officer's head.

*United States v. Klein*, 533 F. Supp. 3d 1, 3 n.6 (D.DC 2021).

But although Judge Bates concluded that a "riot shield" "might" qualify as a dangerous weapon in a given situation, Bates expressed doubts that the government's allegations against Klein could possibly prevail. Klein, like Aaron and Isaac, is accused of merely holding or pushing a shield in the manner of normal shield use—not striking or bludgeoning the shield in any way that would constitute "deadly or dangerous weapon" use.

Criminal concepts such as assault with- or use of a dangerous weapon are common law derivatives.  The drafters of the Model Penal Code, at § 210.0(4), defined deadly weapon as: any firearm, or other weapon, device instrument, material or substance, whether animate or inanimate, which in the manner it is used or is intended to be used is known to be capable of producing death or serious bodily injury.

These definitions and concepts were carefully analyzed by the U.S. Ninth Circuit in *United States v. Dishman*, 486 F.2d 727 (9th Cir. 1973). The *Dishman* Court overturned Dishman's conviction for attempting to board an aircraft while possessing a deadly and dangerous weapon in violation of 49 U.S.C.S. § 1472(l).  The object possessed by Dishman was a harmless starter pistol, similar to a toy cap gun when fired.  Although the trial judge convicted in a bench trial, the Ninth Circuit reasoned that a dangerous or deadly weapon must be one which <u>as a matter of law</u> is intended or readily adaptable use is likely to produce death or serious bodily injury.

THE GOVERNMENT'S SEEMINGLY OPEN-ENDED POWER TO DECLARE ANY OBJECT TO BE A "DEADLY AND DANGEROUS WEAPON" AT THE GOVERNMENT'S PLEASURE IS UNCONSTITUTIONAL AND VIOLATES THE RULE OF LENITY

"Congress did not attempt to define the terms 'deadly or dangerous' weapon," wrote the Ninth Circuit, "finding this not feasible, practical or necessary and leaving it to the court to determine in each case, on an ad hoc basis, whether the weapon was deadly or dangerous." *United States v. Dishman*, 486 F.2d 727, 730 (9th Cir. 1973).  And several courts have punted the question even further, suggesting the definition is entirely up to juries. See, e.g., *United States v. Moore*, 846 F.2d 1163 (8th Cir. 1988) ("the question of what constitutes a 'deadly and dangerous weapon' is a question of fact for the jury").  In effect, this has enabled and empowered federal prosecutors to concoct the most ridiculous, specious, and preposterous accusations of using "deadly and dangerous

weapons" for doing such things as merely wearing a pair of gloves in a place the government calls "restricted." This cannot be the law.

As Chief Justice Marshall explained, "[t[he rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820). It first arose to mitigate draconian sentences. As English statutes kept expanding the death penalty and curtailing mercy, courts tempered them by construing them narrowly. Livingston Hall, *Strict or Liberal Construction of Penal Statutes*, 48 Harv. L. Rev. 748, 749-51 (1935). The canon was well established by the time of Blackstone. 1 William Blackstone, *Commentaries* 88. And it took root in American law soon thereafter. *Wiltberger*, 18 U.S. (5 Wheat.) at 95.

Under the rule of lenity, courts must construe penal laws strictly and resolve ambiguities in favor of the defendant. See, e.g., *Liparota v. United States*, 471 U.S. 419, 427 (1985); see also Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 296 (2012). The touchstone is the text: the "ordinary," evidently intended meaning of "the words of the statute." *Wiltberger*, 18 U.S. (5 Wheat.) at 95.

The rule of lenity is entwined with notice and thus due process. See *McBoyle v. United States*, 283 U.S. 25, 27 (1931) (Holmes, J.). It gives citizens fair warning of what conduct is illegal, ensuring that ambiguous statutes do not reach beyond their clear scope. Lenity expresses our "instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes*, in *Benchmarks* 196, 209 (1967). That approach fits with one of the core purposes of our Constitution, to "secure the Blessings of Liberty" for all citizens. Penal laws pose the most severe threats to life and liberty, as the Government seeks to brand people as criminals and lock them away. To guard against those threats, the rule of lenity favors respect for individual rights. *Wiltberger*, 18 U.S. (5 Wheat.) at 95.

The Ninth Circuit in *Dishman*, *supra*, looked to state law definitions:

> [A] dangerous or deadly weapon is one which in its intended or readily adaptable use is likely to produce death or serious bodily injury." 94 CJS Weapons, § 6(c), page 489; Generally speaking, "[a] deadly weapon is one likely to produce death or great bodily injury." The character of an implement as a deadly weapon is determined by its capacity to inflict death or injury, . . . ." ". . . a toy, or a chocolate candy pistol has no ability to commit a violent or any injury on the person of another, . . . unless used as a club. . . ." 244 Cal. App. 2d 121 at 125, 52 Cal. Rptr. 733 (1966).

Dishman, 486 F.2d at 730.

IT IS ONLY BY DEADLY OR DANGEROUS <u>USE</u> OF A NON-OBVIOUS-WEAPON OBJECT THAT SUCH A NON-OBVIOUS-WEAPON OBJECT BECOMES A "DEADLY AND DANGEROUS" WEAPON; AND THE INDICTMENT FAILS TO ALLEGE ANY SUCH USE.

With additional factual particulars, counts 2, 3, 5, and 7 will fail to state a claim upon which Aaron and Isaac can be subjected to a trial. "If the defendant had struck or attempted to strike with it, the question whether it was or was not a dangerous weapon in the manner used, or attempted to be used, would be one of fact; but the courts quite uniformly hold <u>as a matter of law</u> that an unloaded pistol, when there is no attempt to use it otherwise than by pointing it in a threatening manner at another, it not a dangerous weapon." *United States v. Dishman*, 486 F.2d at 731.

The *Dishman* Court found that the government's accusation of "deadly and dangerous weapon" use must identify either an obviously deadly weapon (such as a real loaded firearm, unlawfully displayed or deployed) or an allegation of how the alleged "weapon" was used in a "deadly and dangerous" manner. In effect, the object becomes a "weapon" only upon a fact-specific description in the indictment of such actual use. "It is . . . only then that the inert object becomes a "deadly and dangerous" weapon." *Dishman*, at 732 ("we hold that Dishman's starter pistol <u>as a matter of law</u> is just not a "deadly and dangerous" weapon per se").

CONCLUSION

FOR THE REASONS DESCRIBED ABOVE, defendants Aaron James and Isaac Westbury request for the Court to require the United States to provide a bill of particulars, explaining with precision how the United States claims the defendants used a "law enforcement shield" as a "deadly and dangerous weapon."

Dated: April 02, 2023    Respectfully Submitted,
 */s/ John M. Pierce*
 John M. Pierce
 **JOHN PIERCE LAW P.C.**
 21550 Oxnard Street
 3rd Floor, PMB 172
 Woodland Hills, CA 91367
 Tel: (213) 279-7846
 jpierce@johnpiercelaw.com
 *Attorneys for Defendant Aaron James*

CERTIFICATE OF SERVICE

I hereby certify that on April 02, 2023, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the District of Columbia.

*/s/ John M. Pierce*
John M. Pierce, Esq.