UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No.: 21-605 (RC) |
| | : | 21-371 (RC) |
| | : | |
| ISAAC WESTBURY, | : | Re Document No.: 130 |
| AARON JAMES, | : | |
| ROBERT WESTBURY, and | : | |
| JONAH WESTBURY, | : | |
| | : | |
| Defendants. | : | |

## ORDER

**DENYING DEFENDANTS' MOTION TO CHANGE VENUE TO THE DISTRICT OF MINNESOTA**

Defendants Isaac Westbury, Aaron James, Robert Westbury, and Jonah Westbury move to transfer venue to the District of Minnesota. *See* Defs.' Mot. Change Venue ("Defs.' Mot."), ECF No. 130. The Government has opposed the motion, *see* Gov't's Opp'n Defs.' Mot. Transfer Venue ("Gov't's Opp'n"), ECF No. 141, and Defendants have filed a reply, *see* Defs.' Reply Gov't's Opp'n Defs.' Mot. Transfer Venue ("Defs.' Reply"), ECF No. 152.

### I. ANALYSIS

Criminal defendants have a constitutional right to trial by "an impartial jury of the State and district wherein the crime [was allegedly] committed." U.S. Const. amend. VI; *see also id.* Art. III ("The Trial of all Crimes . . . shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed."). The Federal Rules of Criminal Procedure reflect the requirement to "prosecute an offense in a district where the offense was committed," Fed. R. Crim. P. 18, but also permit defendants to move to transfer venue either due to local prejudice or for convenience, Fed. R. Crim. P. 21(a)–(b). Where, as here, a defendant moves to

transfer venue due to local prejudice, the "court must transfer the proceeding . . . to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a).

The Supreme Court has recognized the principle that transfer of venue is a "basic requirement of due process" where "extraordinary local prejudice will prevent a fair trial," but emphasized that a pre-voir dire "presumption of prejudice . . . attends only the extreme case." *Skilling v. United States*, 561 U.S. 358, 378, 381 (2010) (citation omitted). Because "juror *impartiality* . . . does not require *ignorance*," even "pervasive, adverse publicity" does not necessarily compel a presumption of prejudice, unless the press coverage is so intense as to "utterly corrupt[]" the trial. *Id.* at 380–81, 384 (emphases in original) (citations omitted). Accordingly, the "default practice of this jurisdiction [is] to conduct voir dire in order to determine whether a fair and impartial jury can be seated." *United States v. Eicher*, No. 22-cr-38, 2022 WL 11737926, at *3 (D.D.C. Oct. 20, 2022) (citing *United States v. Haldeman*, 559 F.2d 31, 41 (D.C. Cir. 1976)). "'[A]dequate *voir dire* to identify unqualified jurors' is the primary safeguard against jury prejudice." *United States v. Ballenger*, 640 F. Supp. 3d 34, 36 (D.D.C. 2022) (quoting *Morgan v. Illinois*, 504 U.S. 719, 729 (1992)).

In *Skilling*, the Supreme Court identified three main factors to guide the inquiry into whether prejudice should be presumed before voir dire: (1) the "size and characteristics of the community in which the crime occurred;" (2) whether press coverage of the crime "contain[s] a confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight;" and (3) the time that elapsed between the crime and the trial. 561 U.S. at 382–83. Courts in this district have considered many motions to transfer

venue similar to that submitted by Defendants in this case.  In every instance, courts have denied such motions after evaluating the *Skilling* factors, finding that defendants failed to establish extraordinary local prejudice that would prevent a fair trial.  *See Eicher*, 2022 WL 11737926, at *1 (denying motion to transfer by defendant charged in connection with January 6, 2021 "[l]ike every other court of this jurisdiction to consider the same argument"); Gov't's Opp'n at 1 n.1 (collecting cases illustrating that "[j]udges on this [c]ourt have denied motions for change of venue in dozens of January 6 prosecutions, and no judge has granted a change of venue in a January 6 case").  After thorough consideration of the arguments advanced by the parties and the *Skilling* factors, the Court is convinced that the same result should obtain here.

### A. Size and Characteristics of the Community

Defendants argue that the District of Columbia's size and characteristics weigh in favor of a presumption of prejudice.  However, as Defendants themselves note, the population of the District is approximately 690,000.  Defs.' Mot. at 11–12.  As other courts have pointed out, the *Skilling* court itself "recognized a 'reduced likelihood of prejudice where [the] venire was drawn from a pool of over 600,000 individuals.'"  *United States v. Brock*, 628 F. Supp. 3d 85, 95 (D.D.C. 2022) (quoting *Skilling*, 561 U.S. at 382).  Moreover, "the District's population is greater in size than those few cases in which the Court has found that transfer to a different jurisdiction was constitutionally required," and it is also "larger than population sizes that the Supreme Court has found reduced the likelihood of prejudice."  *United States v. Rhodes*, 610 F. Supp. 3d 29, 57 (D.D.C. 2022) (listing examples, including *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), in which the Supreme Court found no presumption of prejudice despite a jury pool of only approximately 182,000).  As every other court to consider the question in connection

with a January 6 prosecution has held, the size of the District of Columbia does not weigh in favor of a presumption of prejudice.

Defendants also contend that prejudice is likely because the District of Columbia has a lot of residents employed by government agencies impacted by January 6. *See* Defs.' Mot. at 12–13. But many of these employees likely were not directly affected by the events of January 6 and, regardless, "[v]ague insinuations that federal employees are biased by their employment represent 'exactly the kind of conjecture that is insufficient to warrant transfer prior to jury selection.'" *Ballenger*, 640 F. Supp. 3d at 38 (quoting *United States v. Bochene*, 579 F. Supp. 3d 177, 181 (D.D.C. 2022)). For similar reasons, the Court is unpersuaded by Defendants' argument that "[a]ll residents" of the District were presumably "victimized" by the curfew put in place on January 6 or the restrictions enacted in the months that followed. *See* Defs.' Mot. at 24. Defendants' bald assertion that "every citizen or person present within the city was personally, legally affected by the events centered around January 6, 2021," *id.*, is supported by nothing but conjecture. As another judge in this district stated, many District residents and potential jurors "have no [significant] connection to th[e] events" of January 6 because they "liv[e] and work[] in parts of the city that were unaffected by the attack or the efforts to respond to it." *Ballenger*, 640 F. Supp. 3d at 38. And in any event, "a fair trial is possible even if an event had a significant impact on a community." *See id.*

Next, Defendants argue that the fact that the vast majority of District residents voted for President Biden in the 2020 election supports a finding of prejudice. *See* Defs.' Mot. at 14–16. This type of reasoning has been soundly rejected by the D.C. Circuit and district courts considering similar arguments both generally and in the context of January 6 cases. *See Haldeman*, 559 F.2d at 64 n.43 (explaining that "a community's voting patterns" are not "at all

4

pertinent to venue"); *see also Brock*, 628 F. Supp. 3d at 96 (rejecting January 6 defendant's argument that the voting patterns of District of Columbia residents demonstrate a likelihood of prejudice); *Eicher*, 2022 WL 11737926, at *3 (same); *Ballenger*, 640 F. Supp. 3d at 38 (same).

Finally, Defendants point to the results of multiple surveys which, they argue, show that "substantial majorities of potential jurors in D.C. have prejudged January 6 defendants." *See* Defs.' Mot. at 5–11. First, the D.C. Circuit has explained that "comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel pursuant to procedures, practices, and principles developed by the common law since the reign of Henry II" is favored over "a poll taken in private by private pollsters and paid for by one side." *Haldeman*, 559 F.2d at 64 n.43. Second, courts in this district presented with the same or similar analyses have found that "the surveys are flawed, and none supply persuasive evidence that would support a decision to transfer the case without trying the voir dire process first." *See United States v. Garcia*, No. 21-cr-129, 2022 WL 2904352, at *10 (D.D.C. July 22, 2022); *see also Rhodes*, 610 F. Supp. 3d at 56–57 ("Having considered all of the survey evidence presented by Defendants, the court holds that this is not an 'extreme case' in which juror prejudice can be presumed and mandatory transfer is warranted." (quoting *Skilling*, 561 U.S. at 381)); *Ballenger*, 640 F. Supp. 3d at 39 ("Because of the general presumption against supplanting *voir dire* with polling evidence and because the poll submitted by Defendants fails to establish prejudice even if taken at face value, the Court need not reach the various potential methodological problems with the survey that the Government discusses.").

In sum, the size and characteristics of the District of Columbia weigh against a presumption of prejudice. The Court is confident that thorough voir dire will be sufficient to root out any prejudice along the lines suggested by Defendants that calls into question a potential

juror's ability to be impartial. *See Haldeman*, 559 F.2d at 63 ("[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire.").

### B. Pretrial Publicity

Defendants also contend that "blatantly prejudicial" "pretrial publicity about January 6" necessitates a change in venue. *See* Defs.' Mot. at 16–19 (quoting *Skilling*, 561 U.S. at 382). Defendants emphasize factors such as the "[v]ivid images [of January 6] splashed across D.C. papers[,] websites and television for the last two and a half years"; the "hours and hours of videos of the events of January 6 and hundreds of images of those events"; and the "extensive and persistent" coverage of January 6. *See id.* However, "[p]rominence does not necessarily produce prejudice," and even "pervasive, adverse publicity" does not necessarily compel a presumption of prejudice. *Skilling*, 561 U.S. at 381–84 (citation omitted); *see also Halderman*, 559 F.2d at 61 (finding no prejudice from pretrial press coverage despite the presence of articles "hostile in tone and accusatory in content"). While there has certainly been significant media coverage of January 6, much of it has consisted only of "straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations." *Ballenger*, 640 F. Supp. 3d at 40 (quoting *Haldeman*, 559 F.2d at 61). Moreover, "much of the coverage of the events of January 6 has been national, not local, in nature," such that the "influence of that coverage would be present wherever trial is held." *Id.* (quoting *Bochene*, 579 F. Supp. 3d at 182); *see also United States v. Chapin*, 515 F.2d 1274, 1288 (D.C. Cir. 1975) ("[P]recedent demands that the court take into account whether the publicity is sufficiently localized that potential jurors in another area would be free of any taint from exposure to the press, enabling the change to serve its purpose."); *Eicher*, 2022 WL 11737926, at *3 ("[M]ost communities

6

throughout the country have been exposed to the exact same coverage [of January 6] as Washingtonians.").

Defendants argue that media coverage of January 6 is analogous to that in *Rideau v. Louisiana*, 373 U.S. 723 (1963), in which the Supreme Court reversed a conviction based on a finding that pretrial publicity made a fair trial impossible. *See* Defs.' Mot. at 16–18. But *Rideau* involved pretrial publication of the defendant's own "dramatically staged admission of guilt." *Skilling*, 561 U.S. at 382–83 (describing *Rideau*). By contrast, here, Defendants have not suggested that they have been named or featured in any news stories that District of Columbia residents would have come across. *See Eicher*, 2022 WL 11737926, at *3 ("Defendant identifies no pretrial publicity that identifies her specifically."); *Garcia*, 2022 WL 2904352, at *9 ("[W]hile the court recognizes that the events of January 6 are receiving substantial attention in the media at this time, and a rigorous voir dire will be needed to ferret out potential biases, this particular case has not been subject of attention, and this fact also does not weigh in favor of transferring the case."). And in fact, the only Defendant-specific article that Defendants cite appears to have been published by a local news station *in Minnesota*—the venue in which Defendants move to be tried. *See* Defs.' Reply at 4 n.3 (citing article by a CBS news affiliate in Minnesota). The second *Skilling* factor does not support a transfer of venue in this case.

### C. Time Elapsed

More than three years have elapsed since January 6, 2021. It may be that the "decibel level of publicity about the crimes" has lowered in that time, *see In re Tsarnaev*, 780 F.3d 14, 22 (1st Cir. 2015), but the Court acknowledges that recent events, including Congressional hearings and reports and ongoing and potential high-profile criminal prosecutions and civil suits arising out of the events of that day, have likely kept January 6 more toward the top of the public mind

than it would be otherwise. However, as Defendants have not suggested that their case in particular has been the subject of any District of Columbia or national press attention, any residual press coverage of January 6 is merely "a factor that must be taken into consideration in jury selection." *Garcia*, 2022 WL 2904352, at *9; *see United States v. Gunby*, No. 21-cr-626, 2023 WL 5561871, at *6 (D.D.C. Aug. 29, 2023). The third *Skilling* factor is thus, at most, neutral. *See Ballenger*, 640 F. Supp. 3d at 40.

In sum, the Court finds no reason to presume prejudice on the part of this district's venire prior to voir dire, the appropriate tool here for rooting out prejudice. Like defendants in other January 6 cases, Defendants can be tried fairly and impartially in the District of Columbia.

### D. Defendants' Argument for Recusal

Before concluding, the Court must address Defendants' alternative argument that recusal is warranted. Generally speaking, Defendants contend that "the trial judges of the U.S. District Court of the [District of Columbia], as well as their law clerks and judicial staff"—are "likely residents of the District of Columbia" and thus "have a personal or legal interest in the outcome" of this criminal case. Defs.' Mot. at 21. In that vein, Defendants argue that all such individuals are direct or indirect "victims"—whether because they experienced the events of January 6 or because their taxes have gone to paying costs imposed upon the District's Metropolitan Police Department because of those events. *See id.* at 21–23. Defendants contend that this creates, at the very least, "the appearance of a conflict of interest" requiring recusal—although they also argue that "much more than an appearance of extra-judicial bias and conflicts of interest are at issue here." *Id.* at 23.

It is well-established that "federal judges must maintain the appearance of impartiality," to foster "public confidence in the integrity and independence of judges." *United States v.*

*Microsoft Corp.*, 253 F.3d 34, 115 (D.C. Cir. 2001) (citation omitted).  "[T]o safeguard the integrity of judicial proceedings, the United States Constitution, federal statutory law, and codes of judicial conduct each outline standards for when a judge may—or, in some cases, must—remove [him]self from a case." *Stone v. U.S. Embassy Tokyo*, No. 19-cv-3273, 2020 WL 5653699, at *1 (D.D.C. Sept. 23, 2020); *see also Microsoft Corp.*, 253 F.3d at 113–15.  Due process requires recusal "when, objectively speaking, 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" *Rippo v. Baker*, 580 U.S. 285, 287 (2017) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).

The Supreme Court has recognized that the Constitution mandates recusal only in "extraordinary situation[s]" or when there are "extreme facts." *See Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 886–87 (2009) (finding an extraordinary situation, such that recusal was warranted, where the chairman of defendant company donated $3 million to the judge's campaign while the case was pending).  More commonly, questions of recusal are statutory in nature.  *See Bracy v. Gramley*, 520 U.S. 899, 904 (1997) ("[T]hese questions [about a judge's ability to hear a case] are, in most cases, answered by common law, statute, or the professional standards of the bench and bar.").

Defendants' motion for recusal appears to be primarily based on 28 U.S.C. § 455, which describes a number of circumstances in which a federal judge must recuse himself.  *See* Defs.' Mot. at 23.  The provision of section 455 that has the "broad[est] scope" is section 455(a).  *See Philip Morris USA Inc. v. U.S. FDA*, 156 F. Supp. 3d 36, 49 (D.D.C. 2016).  Section 455(a) provides that any "judge . . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a).  A court applies an objective lens when assessing a motion under section 455(a).  *SEC v. Loving Spirit Found. Inc.*,

392 F.3d 486, 493 (D.C. Cir. 2004); *see also Liteky v. United States*, 510 U.S. 540, 548 (1994) (emphasizing the objective nature of section 455(a)). That means that "[r]ecusal is required when 'a reasonable and informed observer would question the judge's impartiality.'" *Loving Spirit Found.*, 392 F.3d at 493 (quoting *Microsoft Corp.*, 253 F.3d at 114). This standard requires the court to "take the perspective of a fully informed third-party observer who understands all the relevant facts and has examined the record and the law." *United States v. Cordova*, 806 F.3d 1085, 1092 (D.C. Cir. 2015) (cleaned up). Moreover, the court bears in mind that "a reasonable observer must assume that judges are ordinarily capable of setting aside their own interests and adhering to their sworn duties to faithfully and impartially discharge and perform all the duties incumbent upon them." *Philip Morris USA*, 156 F. Supp. 3d at 49 (cleaned up).

In part because "judges are presumed to be impartial," *SEC v. Bilzerian*, 729 F. Supp. 2d 19, 22 (D.D.C. 2010), courts assessing whether to recuse themselves begin with "a presumption against disqualification," *United States v. Nixon*, 267 F. Supp. 3d 140, 147 (D.D.C. 2017) (quoting *Cobell v. Norton*, 237 F. Supp. 2d 71, 78 (D.D.C. 2003)). The party moving for recusal "carries a heavy burden of proof" in overcoming this presumption. *United States v. Ali*, 799 F.3d 1008, 1017 (8th Cir. 2015) (citation omitted). To overcome the presumption, the moving party cannot rest on "bald allegations of bias or prejudice." *Stone*, 2020 WL 5653699, at *1 (quoting *Karim-Panahi v. U.S. Cong.*, 105 F. App'x 270, 275 (D.C. Cir. 2004) (per curiam)); *see also Bilzerian*, 729 F. Supp. 2d at 22 (explaining that "a party seeking recusal must 'show a true personal bias' on the part of the judge by alleging 'specific facts and not mere conclusions or generalities'" (quoting *Bd. of Locomotive Firemen & Enginemen v. Bangor & Aroostook R.R. Co.*, 380 F.2d 570, 576–77 (D.C. Cir. 1967))). In other words, recusal is not warranted "solely

10

because a party claims an appearance of partiality," *In re Aguinda*, 241 F.3d 194, 201 (2d Cir. 2001), or where the moving party relies "upon conclusory, unsupported or tenuous allegations," *In re Kaminski*, 960 F.2d 1062, 1065 n.3 (D.C. Cir. 1992) (per curiam).

      With all of these principles in mind, the Court turns back to the case at hand. Defendants argue that the Court's impartiality could reasonably be "called into question" because the Court "has a personal interest in the litigation or matters related to it." Defs.' Mot. at 23. In support, Defendants point to the fact that the District of Columbia has sued "a long list of [January 6] [d]efendants who allegedly <u>victimized all residents of the District of Columbia</u> either by costing the city substantial funds, terrorizing citizens and residents of Washington, D.C., impinging their rights, and implementing a conspiracy to do the same." *Id.* at 22 (emphasis in original). Defendants also emphasize that the District of Columbia Attorney General has purportedly "declared, alleged, and established on behalf of the District of Columbia that <u>every resident[,] including judges-of the city</u>[,] was personally affected, a personal victim, of the alleged crimes and torts on or related to the events of January 6, 2021." *Id.* (emphasis in original). The upshot, according to Defendants, is that an "outside observer" could conclude that the Court would be highly antagonistic towards Defendants' position and that "fair judgment [would be] impossible." *Id.* at 23 (quoting *Jackson v. Microsoft Corp.*, 135 F. Supp. 2d 38, 40 (D.D.C. 2001)).

      The Court disagrees. Defendants do not cite any "specific facts" to suggest that the Court harbors a "true personal bias" against Defendants. *See Bilzerian*, 729 F. Supp. 2d at 22 (citation omitted). Rather, they make general, conclusory assertions that the Court has a "personal interest" in their case based on allegations purportedly made by the District of Columbia in its lawsuit against an organization and specific individuals involved in the events of January 6. *See*

Defs.' Mot. at 21–23.  Defendants cite no authority—and the Court has not found any—to suggest that a non-party's allegations in an unrelated civil case would cause a reasonable observer to conclude that the Court has a personal interest in the criminal case before it.  The fact that the Court may pay taxes to the District of Columbia does not alter the calculus.  To the extent that the District was forced to incur costs because of the events of January 6, no reasonable person would question the Court's impartiality in this case based on whatever indirect, tangential, or infinitesimally small interest the Court, as a taxpayer, may have in the District of Columbia's finances, especially given that this case does not relate to the District's spending in the slightest.  *See Fairley v. Andrews*, 423 F. Supp. 2d 800, 816 (N.D. Ill. 2006) (explaining that "[a] pecuniary interest, such as that of a taxpayer, 'which a judge has in common with many others in a public matter is not sufficient to disqualify him'" (quoting *In re City of Houston*, 745 F.2d 925, 930 (5th Cir. 1984))); *cf. Del Vecchio v. Ill. Dep't of Corr.*, 31 F.3d 1363, 1374 (7th Cir. 1994) (explaining that recusal is not warranted absent a "direct, personal, and substantial" financial interest (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 826 (1986))).  And finally, Defendants offer no evidence to overcome the presumption that—even assuming the Court *did* have a personal interest in their case—the Court would be able to "set[] aside [its] own interest[] and adher[e] to [its] sworn duties to faithfully and impartially discharge and perform all the duties incumbent upon [it]."  *See Philip Morris USA*, 156 F. Supp. 3d at 49 (cleaned up).  Stated differently, Defendants' "conclusory, unsupported [and] tenuous allegations" of bias are insufficient to justify the Court's recusal.  *See In re Kaminski*, 960 F.2d at 1065 n.3.

## II.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Change Venue (ECF No. 130) is **DENIED**.

**SO ORDERED**.

Dated:  April 18, 2024                                                                            RUDOLPH CONTRERAS
                                                                                                              United States District Judge